**In re ECLAIR BAKERY LTD., d/b/a The Garden Bake Shop a/k/a Garden One Corporation, Debtor.**

**No. 00–B–42283 (REG).**

United States Bankruptcy Court, S.D. New York.

Nov. 9, 2000.

---

Allan Sloane, c/o Eclair Bakings, Ltd., Glen Oaks, New York.

Fred B. Ringel, Robinson Brog Leinwand Green, Genovese & Gluck P.C., New York City, for 255 Mall LLC.

Wendy Rosenthal, New York City, United States Trustee's Office.

## DECISION ON LANDLORD'S MOTION FOR ORDER GRANTING RELIEF FROM AUTOMATIC STAY, AND TRANSFERRING CASE TO EASTERN DISTRICT OF NEW YORK

ROBERT E. GERBER, Bankruptcy Judge.

### Introduction and Summary

By motion, initiated by order to show cause, brought by 255 Mall, LLC ("Landlord"), and opposed by the debtor Eclair Bakery Limited (d/b/a The Garden Bakery, The Garden Bakery) ("Debtor"), the Landlord moves for an order, pursuant to Bankruptcy Code section 362(d), granting relief from the automatic stay to remove the Debtor from possession. The Landlord also seeks an order, under 28 U.S.C. § 1412, transferring this chapter 11 case to the Eastern District of New York. For the reasons that follow, both requests for relief are granted.

The Debtor, which is owned and operated by an individual, Allan Sloan, is in the business of the sale of baked goods. It operates a bakery in leased premises at 256–03 Union Turnpike (the "Bakery") in the Glen Oaks Shopping Center in Glen Oaks, Queens, New York. The Bakery, as described below, has been the focus of numerous landlord-tenant disputes, and four separate chapter 11 filings in the Eastern and Southern Districts of New York—although, as described below, the first three filings, all in the Eastern District of New York, were by a different corporation, also owned and controlled by Mr. Sloan, which, just before the Debtor's filing here, assigned the lease for the Bakery to the Debtor. Mr. Sloan filed a petition for relief on behalf of the Debtor

under chapter 11 of the Code, without counsel,[1] on October 3, 2000.

The Debtor came to occupy the Bakery some years after the execution of a ten-year lease dated December 1, 1992 (the "Lease"), under which E & Y Bakery, Inc. ("E & Y") (a/k/a B & B Garden Bake Shop) was the original named tenant. After an assignment, the propriety of which is disputed,[2] by E & Y to another corporation, Garden One Inc. ("Garden One"), Garden One had a series of rent payment disputes with the Landlord, leading to extensive landlord-tenant litigation in the Civil Court of the City of New York, Queens County (the "Civil Court"); three warrants of eviction; and three bankruptcy cases, all filed on Garden One's behalf by Mr. Sloan, in the Eastern District of New York.

A second assignment took place on October 2, 2000, one day before the chapter 11 case in this Court was filed. At that time, Garden One assigned all of its assets and liabilities, including its interest under the Lease (without Landlord consent),[3] to Debtor.

Of particular significance are three stipulations, so ordered by the Civil Court, whereby Garden One (1) consented to pay all rent due; (2) agreed not to make further applications to vacate or modify the stipulations, or the stay of execution of the warrant of eviction; and (3) (in at least two of those stipulations), waived any and all defenses and counterclaims relating to the non-payment proceedings. Garden One defaulted on payment after its execution of each of these stipulations. Each of the three bankruptcy cases that Garden One filed in the Eastern District came immediately after it unsuccessfully moved in state court to stay execution of the warrant of eviction, and before the warrant was executed.

As successor cases were filed, Judge Stan Bernstein of the Eastern District Bankruptcy Court, to whom all of the Eastern District cases had been assigned, placed increasing restrictions on subsequent filings. In the last of the three Eastern District bankruptcy cases filed by Garden One, Judge Bernstein, in a lengthy opinion (issued September 6, 2000, less than four weeks before this filing), dismissed Garden One's case as a bad faith filing; directed that "the dismissal be with prejudice to filing for any relief under any chapter or provision of the Bankruptcy Code for two years in this district or any other district of the United States"; and awarded sanctions.

Garden One's last application for a state court stay was made on September 29, 2000. Garden One was granted one last chance to save itself from the eviction process by paying the rent arrears in full by October 2, 2000. However, it failed to make payment, and by an order issued by the Civil Court on October 2, 2000, the Landlord was permitted to proceed with the eviction. On this same day, Mr. Sloan caused Garden One to assign all of its assets and liabilities—including, significantly, the Lease—to the Debtor. On October 3, 2000, the following day, the Debtor filed here.

---

1. It was, however, established at the hearing on this motion that Mr. Sloan had been trained as a lawyer and practiced law for 15 years, though he no longer practices as such.

2. The Lease required the Landlord's approval, in writing, incident to an assignment. Without dispute such written approval was not obtained, but the Landlord accepted rent under circumstances under which the Debtor argues knowledge of the assignment should have been inferred and (despite language in the Lease providing that no waiver could be based on collection of rent), a finding of waiver should be made. Whether the assignment from E & Y to Garden One was proper is a peripheral issue that the Court does not need to address.

3. The Landlord contends that this assignment likewise was unauthorized. The Court does not rule on this issue either, though it considers it appropriate to consider the timing of the assignment relative to the landlord-tenant dispute that triggered it, and the time of the filing in this Court that followed it.

The Landlord—contending, in essence, that the filing here, to protect the same leasehold that was the subject of the three Eastern District cases, was "more of the same," and that the assignment of the Lease to the Debtor, and filing here, was a device to avoid Judge Bernstein's bar against further filings by Garden One— argues that the above facts, and others described below, show cause for relief from the stay. It argues that with the Debtor's predecessor having forfeited the rights to the Lease prepetition, there is no Lease to assume; that the Debtor cannot effectuate a plan of reorganization based on continued occupancy of the Bakery; and that the pattern of abuse here (especially after the most recent tactics, to circumvent Judge Bernstein's decision) provides an additional basis for a finding of cause. The Landlord further argues, in substance, that with all relevant factors showing an Eastern District nexus, and with the Eastern District's familiarity with the background of this filing, transfer of this case to the Eastern District is warranted in the interests of justice.

The Debtor opposes the motion by arguing that its possessory and equitable interests in the Lease justify denial of relief from the stay; that it has a wholesale business that it thinks can be successful; that it has found an investor prepared to invest $85,000 in the Debtor (assuming that the Debtor can keep the Lease) and that the Lease is necessary for its reorganization. It argues further that venue in the Southern District should be maintained because the Debtor has sufficient assets and ties in the Southern District of New York.

As noted above, and for the reasons set forth below, the Court rejects the Debtor's contentions, and grants both relief from the stay and transfer.

### Findings of Fact

The Court conducted proceedings with respect to the motion on October 10, 2000, October 12, 2000 (the "October 12 hearing") and October 23, 2000 (the "October 23 hearing"), the latter two of which were evidentiary hearings.[4] Its findings of fact, as developed in those hearings (and which unfortunately are lengthy, by reason of the lengthy litigation between landlord and tenant that led to this filing), are as follows:

The Debtor is one of four or more corporations engaged, in one way or another, in the baking business of which Mr. Sloan is or once was a principal or had an interest.[5] Two are most relevant: Garden One, the

---

**4.** On the initial return date of the motion, October 10, Mr. Sloan appeared on behalf of the Debtor pro se, asserting that he wished more time before the start of the hearing and wished to retain counsel on behalf of the Debtor. Although of the view that Mr. Sloan had long been on notice of the need for a corporate debtor to be represented by counsel (this having been commented on in Garden One's predecessor chapter 11 cases), and although it was satisfied, after hearing the live testimony of the process server, that the Debtor had been duly served at the time the Court had directed, the Court granted a brief continuance.

On the day of the continued hearing, October 12, 2000, an attorney appeared for the Debtor, advising that he had received a retainer check issued by a corporation controlled by Mr. Sloan, but that it had not yet cleared; he sought a further adjournment until the check cleared. The Court declined a further extension (although it stated that if the check did not clear, it would permit counsel to with-

draw), and the hearing commenced with the Debtor assisted by counsel. An affidavit and brief were also faxed to the Court from that attorney's office the day before, although each was executed only by Mr. Sloan and not by the attorney. When it was impossible to continue in the afternoon of the first day of the hearing, the Landlord requested that the hearing continue the following morning. However, at the Debtor's request (which was granted, because the Court wanted to give the Debtor and its counsel more time to make any showings they considered appropriate), the hearing was adjourned for another 11 days. On the morning of the continued hearing, the Court was advised that the check that had been issued to the attorney "bounced," and the hearing was completed with Mr. Sloan once more speaking for the Debtor corporation pro se.

**5.** Mr. Sloan had caused the filing of bankruptcy petitions for two other bakeries that he owned, Eclair Bakery Cafe, Inc. ("Eclair")

assignor of the Lease and the subject of three prior bankruptcy cases in the Eastern District, and the Debtor, the Lease assignee.

*Rent Stipulation # 1*

Mr. Sloan acquired Garden One on July 2, 1998, from an entity known as B & B Garden Bake Shop (a/k/a E & Y), the prior operator of the Bakery. Mr. Sloan was the president and sole shareholder of Garden One.

Less than two months later, the Landlord sought to dispossess Garden One from the Bakery, by commencing a non-payment proceeding against E & Y and Garden One in the Civil Court, and a warrant of eviction was thereafter issued. However, in accordance with a common practice in the Civil Court, the Landlord and Garden One entered into a stipulation of settlement ("Rent Stipulation # 1") on August 25, 1998, which stayed the execution of the warrant of eviction for seven days during which Garden One could tender all outstanding rent payments. If the default was not cured within seven days, Rent Stipulation # 1 authorized the Landlord to immediately execute upon the warrant of eviction. However, Garden One failed to make the required payments.

*Bankruptcy Case # 1*

On October 7, 1998, Mr. Sloan caused Garden One to file for relief in a case under chapter 11 in the United States Bankruptcy Court in the Eastern District of New York ("Bankruptcy Case # 1"). The case was assigned to Judge Stan Bernstein. Mr. Sloan filed the case without counsel, and on November 19, 1998, the case was dismissed with prejudice for the Debtor's failure to cure filing deficiencies—the failure to include required schedules and statements—under Eastern District Local Rule 1002–1(b).

*Rent Stipulation # 2*

At the time of the dismissal of Bankruptcy Case # 1, Garden One was still operating at the Bakery. Shortly after Bankruptcy Case # 1's dismissal, Garden One and the Landlord entered into a second stipulation of settlement ("Rent Stipulation # 2") on December 15, 1998. Among other things, Rent Stipulation # 2 provided for the parties' consent to restore the Landlord's non-payment proceeding to the state court calendar; to vacate the prior judgment; and to enter a new judgment to reflect the rent then due. Rent Stipulation # 2 also contained a provision under which Garden One waived any and all defenses and counterclaims relating to the non-payment proceeding, and agreed not to make any further applications to a court to stay the execution of the warrant of eviction.[6]

and Aliotte Bakery. Eclair, a wholesale bakery that was acquired by Mr. Sloan in 1993, filed a voluntary chapter 11 petition on October 19, 1995, in the Southern District of New York. Mr. Sloan was Eclair's president and sole shareholder. The case was subsequently assigned to Bankruptcy Judge Jeffry Gallet in the Southern District of New York and was ultimately converted to chapter 7 on August 13, 1996.

Mr. Sloan was also the president and a shareholder (although the record is silent as to the percentage of stock ownership) of Aliotte Bakery Cafe, Inc., an entity that was the apparent successor to two companies that had previously filed chapter 11 petitions. Aliotte also filed for relief under chapter 11, but in the Eastern District of New York. That case was assigned to Bankruptcy Judge Stan Bernstein and was ultimately converted to chapter 7. Both Mr. Sloan and the Debtor here were defendants in an adversary proceeding commenced by Neil Ackerman, the chapter 7 trustee in the Aliotte Eastern District case. Mr. Ackerman ultimately obtained a default judgment against each of them for failure to appear and comply with Judge Bernstein's orders. To date, the default judgment has not been paid.

6. At the hearing on the motion here, Mr. Sloan testified that he could not remember whether Garden One had executed such a waiver. He testified on the motion here that he believed he had defenses to the Landlord's claims for rent, based on an assertion that the Landlord renovated the shopping center and had emptied out all of the retail stores, leaving Garden One as the sole remaining tenant. Mr. Sloan asserted that Garden One's retail business declined because it was the only store left in the shopping center. However,

However, once again Garden One failed to make the payments pursuant to Rent Stipulation # 2, and the Landlord sought to execute upon the warrant of eviction.

### Bankruptcy Case # 2

On April 13, 1999, Mr. Sloan caused Garden One to file another chapter 11 case, once more in the Eastern District of New York ("Bankruptcy Case # 2"). He did so once more without counsel, and failed to disclose Garden One's first bankruptcy filing and its subsequent dismissal. Once again, the case was assigned to Eastern District Judge Stan Bernstein. Soon thereafter, the Clerk issued a notice of deficiency for failure to file the required schedules and statements, and Garden One once more failed to cure the filing deficiencies. On April 22, 1999, the Landlord moved, by order to show cause, to terminate the section 362 stay, and to dismiss Bankruptcy Case # 2 with prejudice. No opposition was filed by Garden One, and Bankruptcy Case # 2 was dismissed with prejudice by an order dated May 3, 1999. That order, among other things, prohibited any new chapter 11 filing by Garden One for a year. It also terminated the section 362 stay *nunc pro tunc*, and provided that if the Debtor filed a case under chapter 7 (such a filing not being barred by the order), then the section 362 stay would be inapplicable with respect to the Landlord or the Bakery. The order also retained jurisdiction with respect to the relief granted.[7]

as the Landlord notes on this motion, and as noted above, Garden One agreed that it had no counterclaims or defenses to the Landlord's claims for rent.

7. When the Court asked Mr. Sloan whether he read this order, Mr. Sloan stated he did not remember reading it, but he remembered Judge Bernstein declaring in open court that Garden One could not file bankruptcy for one year.

8. Rent Stipulation # 3 was signed by both Mr. Sloan and an attorney representing his corporation Garden One.

### Rent Stipulation # 3

Following the dismissal of Bankruptcy Case # 2, the Landlord and Garden One entered into a third stipulation ("Rent Stipulation # 3") on July 25, 2000.[8] Similar to the earlier agreements, Rent Stipulation # 3 provided for a stay of the warrant of eviction (through August 4, 2000), pending payment for all outstanding rent obligations. Garden One acknowledged owing Landlord $20,404, and once again agreed that it "waives any and all defenses and counterclaims to the instant non-payment proceeding up to this date." (Landlord Exh. 9, ¶ 6). Rent Stipulation # 3 further provided:

Garden One agrees not to make any application to vacate or modify this Stipulation and further agrees not to make any application to this or any other court for a stay of execution of the warrant of eviction in the event Garden One defaults under the terms contained herein.

*Id.* ¶ 10.

However, Garden One defaulted under the terms of Rent Stipulation # 3 as well. As a result, the Landlord commenced a proceeding to recover possession of the Bakery and a warrant of eviction was issued on August 8, 2000.

### Bankruptcy Case # 3

On August 10, 2000, Mr. Sloan caused Garden One to file a third chapter 11 case in the Eastern District of New York ("Bankruptcy Case # 3").[9] Once again, the petition was filed by Mr. Sloan without counsel, and it did not list Garden One's

9. When Mr. Sloan was asked at the hearing on this motion whether he filed this petition, he responded, with an answer that typified much of his testimony—perhaps technically accurate but hardly open and candid—"It looks like my handwriting." (Mr. Sloan thereafter admitted that Garden One had filed another chapter 11 case in the Eastern District of New York; had done so to delay the warrant of eviction; and that this was the third petition that was filed by Garden One over a period of time.)

two prior bankruptcy cases.[10] At this time Garden One was still operating at the Bakery.

Bankruptcy Case # 3 was once again assigned to Eastern District Judge Stan Bernstein. On August 17, 2000, Judge Bernstein issued an order to show cause, requiring Mr. Sloan to explain why Bankruptcy Case # 3 should not be dismissed, and why sanctions should not be imposed for bad faith filing pursuant to Fed. R.Bankr.P. 9011. After a full evidentiary hearing, Judge Bernstein issued a Memorandum and Order on September 6, 2000 (the "Judge Bernstein Decision") dismissing Garden One's third Chapter 11 case with prejudice.

Based upon the totality of circumstances, Judge Bernstein concluded that Mr. Sloan abused the bankruptcy process by filing a petition in bad faith.[11] Judge Bernstein dismissed Garden One's filing with prejudice, and prohibited any further filing for *any* relief, under *any* chapter or provision of the Bankruptcy Code, in *any* district of the United States, for two years.

Finally, Judge Bernstein retained jurisdiction for the purpose of determining the full range of sanctions against Mr. Sloan as the principal to "this repeated pattern of gross abuse of process" and as the person who signed the petition under oath. He imposed monetary sanctions of $5,000 upon Mr. Sloan individually for abuse of process and violations of his obligations under Fed.R.Bankr.P. 9011.[12] To date, Garden One has not appealed Judge Bernstein's Decision and Mr. Sloan has not paid the $5,000 sanction.[13]

*Further Proceedings in Civil Court*

After the dismissal of Bankruptcy Case # 3, the Landlord was once again free to recover possession of the Bakery. Garden One obtained an *ex parte* stay of the Landlord's eviction proceeding in the Civil Court, Queens County, Non–Housing Part, but this was soon vacated, after the Landlord had an opportunity to be heard, on September 25, 2000. At that time, the Civil Court authorized the Landlord to proceed with the execution of the warrant of eviction upon statutory marshal's notice.

Nevertheless, Garden One had still another opportunity to relieve itself from the eviction process by paying arrears in full by 9:30 a.m. on October 2, 2000. However, Garden One failed to pay the arrears by this new deadline. By an order of the Civil Court dated October 2, 2000, all stays were vacated and the Landlord was permitted to proceed with the eviction. That

10. When asked at the hearing on this motion why his petition did not list Garden One's prior bankruptcy cases, Mr. Sloan responded by stating that he did not understand disclosure of such to be required as part of the petition, and thought that—although the form of petition required the debtor to list "Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet)" (Landlord Exh. 11)—it required a list of *current* or *pending* actions.

11. The Judge Bernstein Decision included extensive findings of fact and conclusions of law, fully consistent with the record made here, and the Judge Bernstein Decision was not appealed and is now final. However this Court was not asked to apply principles of res judicata or collateral estoppel in this case based on the Judge Bernstein Decision, and the Court considers it unnecessary to determine whether in this case (involving a different corporation than the corporation in Bankruptcy Case # 3, but where the new corporation is under the ownership and control of the same individual and is the assignee of the old corporation with respect to the same property), principles of res judicata and/or collateral estoppel should apply.

Rather, this Court has made its factual findings based upon the independent evidentiary showing made here. Needless to say, however, acts the Debtor and Mr. Sloan took thereafter to sidestep the Judge Bernstein Decision make the Judge Bernstein decision highly relevant, and it would be such even if one or more of Judge Bernstein's findings had for some reason been mistaken.

12. Judge Bernstein further authorized the Landlord to file a request for reimbursement for the Landlord's costs and attorneys fees.

13. Mr. Sloan stated at the hearing here that the sanction was not paid because he never received a bill for it.

eviction, unless once more stayed, would take place in just a few more days.

*Bankruptcy Case # 4*

On October 2, 2000, an Assignment Agreement (the "Second Assignment") was entered into between Garden One, as assignor, and the Debtor, as assignee, and signed by Mr. Sloan, both as president of assignor Garden One and as president of assignee Debtor. The Assignment transferred all of Garden One's assets, property and beneficial interests to Debtor in consideration for the Debtor's assumption of Garden One's liabilities.[14]

The following day, October 3, 2000, the Debtor filed a petition for relief under chapter 11 in the Southern District of New York. The case (which, like the three Garden One Cases in the Eastern District, was filed by Mr. Sloan without counsel) was assigned to this Court. The petition, filled out entirely in handwriting, listed 256–03 Union Turnpike, in Queens—the address of the Bakery—as the Debtor's address,[15] and its accompanying papers, also filled out in handwriting, listed as those holding the 20 largest claims many, but not all, of the creditors listed in Schedule "B" of the Assignment.

14. The assets set forth in Schedule "A" of the Assignment included tenant rights under the Lease, fixtures and equipment located at the Premises, accounts receivable, and a customer list. The liabilities set forth in Schedule "B" of the Assignment included:

(1) Rent to the Landlord in the amount of $33,800
(2) Con Edison—$25,000
(3) Bell Atlantic—$5,000
(4) Seymour Siegel (Holder of Mortgage)—$180,000
(5) Ackerman (Trustee) re: Aliotte—$375,000 (Disputed)
(6) IRS—(Approx) $75,000
(7) Marshal Martin Bienstock (as collection Agent for certain creditors)—$50,000

The basis upon which the Ackerman debt (which had been reduced to judgment, which was final) was disputed was not stated.

15. The basis for the Debtor's filing in the Southern District of New York was said by Mr. Sloan to be a Manhattan office used to

The Debtor' S.D.N.Y. Local Rule 1007–2 affidavit,[16] also written out by hand, stated, in relevant part:

3. Eclair is in the business of baking baked goods for the retail & wholesale market from its location at 256–03 Union Turnpike, Glen Oaks, Queens.

Its financial difficulties arise mainly due to the Landlord. . . .

*Id.*

While Mr. Sloan testified that the creditors of Garden One are now the creditors of Debtor, he added that there were some creditors of the Debtor who had not been listed that were not creditors of Garden One.[17] Mr. Sloan admitted that he did not seek authorization to file on behalf of the Debtor from Judge Bernstein, and did so knowingly; his stated reason was that because the Debtor was a separate company, he was not required to seek such authorization. Mr. Sloan admitted that notice of the Assignment to the creditors of Garden One and Debtor was not made, and that consent by the Landlord to the Assignment was not obtained. Finally, Mr. Sloan conceded that at the time he was asked—

conduct the Debtor's wholesale business and to maintain customer relations. At the hearing on this motion, Mr. Sloan testified that this office is part of his residence. In light of the determination to transfer the case to the Eastern District (the district corresponding to the address shown on the petition here, but which, as noted below, is deemed the appropriate venue for more fundamental reasons) under 28 U.S.C. § 1412, it is unnecessary to consider the propriety of venue under 28 U.S.C. § 1408.

16. While purporting to be an affidavit, the affidavit was not sworn to before a notary.

17. He did not identify any, however. In his testimony, Mr. Sloan expressed a belief that he "should amend" the Debtor's petition to include these additional creditors and their claims, including the default judgment held by Mr. Ackerman. He stated that he listed Garden One's creditors in the Debtor's petition to make it known that he intended to pay all the creditors of Garden One in full.

October 12—postpetition rent for the Bakery had not been paid.[18]

As a basis for a conclusion that if the Court now denied stay relief, things would be different, Mr. Sloan testified as to a potential capital infusion, to be made pursuant to a "subscription agreement," of $85,000, "contingent upon Eclair's obtaining possessory tenant rights to the premises at 256–03 Union Turnpike"—i.e., rulings permitting continued occupancy by the Debtor of the Bakery. This capital infusion, to be made by an individual named Lawrence Rapp, allegedly would be made to the Debtor in exchange for the issuance of 50% of the Debtor's common stock. The Court does not find either the existence, or the likelihood, of this capital infusion credible, and rejects it as a reasonable basis for concluding that the Landlord should now be denied relief from the stay. The Court declines to draw any conclusions in the Debtor's favor based on this alleged subscription agreement, as an amalgam of concerns as to the authenticity of the alleged subscription agreement (and in particular, the lack of any extrinsic evidence of its existence); the implausibility of a cash infusion for stock, given the

Debtor's debt (as listed on Assignment Agreement Exh. B) of at least $743,800, the requirements of the Absolute Priority Rule,[19] and the lack of any basis to conclude that a stock investment into this capital structure would be anything other than worthless; and Mr. Sloan's lack of credibility, given his demeanor and evasive answers in the hearing and his track record of broken promises.[20]

Based on the totality of the circumstances, as described and documented above, and after considering the credibility of the witness Mr. Sloan, the Court makes the following additional findings of fact:

(1) There is an identity of interest, and control, as between Garden One and the Debtor;

(2) To the extent relevant here, all corporate decisions on the part of each of Garden One and the Debtor were made by Mr. Sloan;

(3) This case was filed as a tactical step in connection with Mr. Sloan's battles with the Landlord, all with respect to the Bakery, first as principal of Gar-

18. When the Court granted the request by the Debtor and its then-counsel to continue the hearing on this motion for 11 more days, thereby delaying any determination on the Landlord's relief from stay motion, the Court granted the continuance on condition that the Debtor pay the pro-rata portion of the October rent that related to the postpetition period. At the time of the continued hearing, the Landlord's counsel reported that a check had been delivered, but had not yet cleared.

After this matter was sub judice, the Landlord's counsel submitted a declaration to the Court, as he had been authorized to do, reporting that the October rent check, like the check for payment to the Debtor's attorney, "bounced." The Court had warned the Debtor that it would regard a failure to pay postpetition rent as still another basis for finding cause for relief from the stay. Mr. Sloan responded by letter, stating that he had put funds into the account to cover the check (albeit four days after the check was issued), suggesting that the check was returned unpaid for uncollected funds, rather than insufficient funds. The Court does not decide whether stay relief should also be granted by

reason of this Debtor error, if it was an error, as it concludes that relief from the stay is warranted for each of two independent reasons, discussed below.

19. The payment of the rent arrears (necessary to assume the lease and preserve it, assuming that the lease could be assumed) and priority tax claims would by themselves exceed the amount of the capital infusion. There is no reasonable basis upon which the Court can conclude that the Debtor, even assuming that the alleged infusion of $85,000 in capital were bona fide, could achieve its stated intention of paying its unsecured creditors in full and have anything left to make a distribution to equity.

20. Of course, once again assuming the bona fides of the subscription agreement, it would, by its conditions, require the Court to approve assumption of the Lease. Given the track record of repeated defaults with respect to the Bakery, the Court has substantial concerns as to how the Debtor could ever provide the Landlord with adequate assurance of future performance.

den One, and then as principal of the Debtor;

(4) This case is predominantly a two-party dispute between the Debtor (as successor to Mr. Sloan's assignor corporation, Garden One) and the Landlord;

(5) This case was filed for the predominant purpose, if not the sole purpose, of blocking measures by the Landlord to recapture the Bakery, and in particular to utilize the automatic stay provided by section 362 of the Bankruptcy Code with respect to the Bakery to block Landlord remedies;

(6) The Debtor sought to exploit section 362's automatic stay not for a temporary "breathing spell," but, rather, as a means to maintain possession without compliance with tenant responsibilities, and to effect delay, and, if possible, a total blockage, of Landlord remedies;

(7) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Landlord to enforce its rights;

(8) The Assignment by Garden One to the Debtor, and the subsequent filing here, each resulted from an intention on the part of Mr. Sloan to sidestep the Judge Bernstein Decision in the Eastern District barring a further bankruptcy filing by Garden One;[21]

(9) This filing violates the spirit, if not the letter, of the Judge Bernstein Decision;

(10) This case was filed in bad faith;

(11) This case was filed in the Southern District of New York because it had the potential to be a more favorable forum than the Eastern District of New York, where the Bakery is located, and where the prior cases with respect to the Bakery were filed—i.e., for "forum shopping"; and

(12) While transfer of this case to the Eastern District of New York would not be materially more convenient to any creditor, neither would it be materially less convenient to any creditor, or to the Debtor. Indeed, the only creditor that has appeared and participated in the bankruptcy cases of Garden One or the Debtor is the Landlord, which is the movant here and requests the transfer.

### Conclusions of Law

Bankruptcy Code Section 541 of the Bankruptcy Code vests the estate with the debtor's legal and equitable interests in property as of the commencement of the case, which are, of course, at least initially protected by the automatic stay pursuant to Bankruptcy Code section 362. But section 362(d) of the Code provides for relief from that stay, under appropriate circumstances. Code section 362(d)(1) provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—
>
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.....

The Landlord argues for the existence of cause in two respects. Each is discussed in turn.

### Termination of the Leasehold

The Landlord's first point is that by reason of the prepetition termination of the Lease, there is no longer any legally cognizable interest for the Debtor to protect. As a corollary of that, the Landlord argues that there now is no Lease for the Bakery for the Debtor to assume, and that

---

**21.** Despite Mr. Sloan's testimony to the contrary (which the Court does not regard as credible), the Court concludes that Mr. Sloan strategically moved Garden One's assets to the Debtor (1) to create a new debtor, in place of Garden One so that the new debtor could file a bankruptcy petition under a name other than Garden One, which was prohibited from filing pursuant to the Judge Bernstein Decision, and (2) to stay the warrant of eviction that was issued on October 2, 2000.

without the Bakery which is the center of the Debtor's operations, there is no basis upon which the Debtor can reorganize. The Debtor disputes the premise, arguing that equitable and possessory interests (discussed below) provide a basis for denial of relief from the stay for cause.

■ However, the Debtor has confused matters that entitle it to stay protection in the first instance with matters relevant to whether the stay should be continued, and its points are not relevant to the Landlord's points with respect to its entitlement to stay relief. Congress has generally left the determination of property rights in the assets of the bankruptcy estate to state law. *See Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (recognizing property interests are created and defined by state law and "unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding"); *In re Issa Corp.*, 142 B.R. 75, 77 (Bankr.S.D.N.Y.1992) (citing *Butner*). Under the law of New York, applicable here, the issuance of a warrant of eviction cancels the lease between the parties and annuls the relationship of landlord and tenant. *See* Real Property Actions and Proceeding Law ("RPAPL") § 749(3).[22] *See also Iltit Associates v. Sterner*, 63 A.D.2d 600, 405 N.Y.S.2d 68, 69 (1st Dept.

1978) (Subject to circumstances under which the rule might "give way," the "issuance of a warrant of eviction annuls relationship of landlord and tenant").[23]

■ Particularly because it is common, in New York rent nonpayment summary proceedings, for a warrant of eviction to be issued with the actual execution of the warrant stayed (thereby providing the tenant a further opportunity to cure before eviction), *see In re Reinhardt*, 209 B.R. 183, 186 (Bankr.S.D.N.Y.1997) (explaining the practice), it is not uncommon for the debtor still to be in possession in its leasehold at the time of filing, notwithstanding the earlier issuance of the warrant of eviction and consequent termination of the lease. What then remains are (1) an equitable interest in the property and the potential to reinstate the landlord-tenant relationship, as RPAPL § 749(3) provides, and (2) a possessory interest in the property.[24] As the Debtor points out, each of these two interests triggers the protection of the automatic stay. The first is in the nature of a redemption right, which can be exercised by returning to state court to seek vacatur of the warrant of eviction, or such other relief as the state court might consider appropriate. The second is the naked possessory right recognized by the Second Circuit in *In re 48th Street Steakhouse*. *See* 835 F.2d at 430 ("a mere possessory interest in real property, without any accompanying legal interest, is suffi-

22. RPAPL § 749(3) provides, in relevant part: The issuing of a warrant for the removal of a tenant cancels the agreement under which the person removed held the premises, and annuls the relation of landlord and tenant, but nothing contained herein shall deprive the court of the power to vacate such warrant for good cause shown prior to the execution thereof.

23. The filing of a bankruptcy petition does not resurrect a lease, and a bankruptcy court does not have the power to resurrect a lease which was terminated prior to the filing of a lessee's bankruptcy petition. *See Bell v. Alden Owners, Inc.*, 199 B.R. 451, 458 (S.D.N.Y.1996); *Bucknell Leasing Corp. v. Darwin (In re Darwin)*, 22 B.R. 259, 262 (Bankr.E.D.N.Y.1982).

A state court judgment issued prior to the filing of a debtor's bankruptcy case is res judicata in the bankruptcy case, and the debtor may not relitigate issues already decided by the state court. *Bell*, 199 B.R. at 458; *Manhattan King David Restaurant, Inc. v. Levine*, 163 B.R. 36, 39 (S.D.N.Y.1993); *In re Lady Liberty Tavern*, 94 B.R. 812, 814 (S.D.N.Y.1988) (a bankruptcy court judge should give preclusive effect to a state court's judgment terminating a lease prepetition and awarding possession of the premises to the landlord).

24. *See In re 48th Street Steakhouse*, 835 F.2d 427 (2d Cir.1987) (affirming the protection of that possessory right).

cient to trigger the protection of the automatic stay").

■ However, while these remaining rights on the part of the debtor tenant trigger the applicability of the automatic stay in the first instance, they are not determinative of the fundamentally different question as to whether the stay, once triggered, should be modified or terminated for cause. That distinction was confirmed by the analysis of Judge Schwartzberg (later affirmed by Judge Goettel of the District Court) in *In re GSVC Restaurant Corp.*, 3 B.R. 491, 494 (Bankr. S.D.N.Y.), *aff'd* 10 B.R. 300 (S.D.N.Y. 1980).[25] Thus the Debtor's analysis, which seeks to equate the two, misses the mark. Instead, it is necessary to review the case law dealing with the real question—to what extent does the issuance of the warrant prior to the filing provide cause, under section 362(d)(1), for *relief* from the stay?

In addressing this, the Court has the benefit of a substantial body of authority in this district since the enactment of the Code and its section 362(d)(1), establishing the general rule and its limited exceptions. Judge Brozman's 1985 decision in *W.A.S. Food Service Corp.*, 49 B.R. 969 (Bankr. S.D.N.Y.1985), explains both. In *W.A.S.*, in the now-familiar fact pattern, the debtor tenant remained in possession following prepetition defaults and state court landlord-tenant proceedings in the New York City Civil Court. A stipulation in that court had provided for the immediate issuance of a warrant of eviction, but with an opportunity to cure: so long as rent pay-ments under the stipulation were timely tendered, execution of the warrant of eviction was stayed. *See* 49 B.R. at 970–971.

Judge Brozman was faced with a trustee's motion to assume and assign a lease; the effort was opposed by the landlord, who had noted, in reliance on RPAPL § 749(3) and *GSVC*, that there no longer was a living lease for the trustee to assume and assign. Judge Brozman recognized that the trustee or debtor in possession would inherit the tenant's rights and could seek to pursue them, *see* 49 B.R. at 972, but quoted approvingly Judge Goettel's analysis in *GSVC*:

> [A] more difficult problem arises where the lease has already been terminated according to its terms under the applicable state law and final state process has been issued, evicting the tenant. In this instance, the trustee has nothing to assume.
>
> *Id.*

In *W.A.S.*, unlike many of these cases (including the Debtor's case here), there was still ongoing litigation between the landlord and tenant. *See* 49 B.R. at 973 ("Since the summary proceeding by [landlord] Durst against [debtor-tenant] Seascapes is pending before the Civil Court of New York County, that court remains the proper forum for the debtor to seek relief unless the summary proceeding is removed to this court"). For that reason, while Judge Brozman determined that she could not then permit assumption of the lease,[26] she continued the automatic stay for a reasonable time pending settlement or a resolution in the state court.[27] How-

---

**25.** Judge Schwartzberg noted:

> Assuming ... that the debtor's *de facto* possession is a sufficient nexus to invoke the protection of the automatic stay under 11 U.S.C. § 362, such stay is subject to termination or modification by the court ... for cause.
>
> *Id.*

**26.** She held that while the debtor and trustee correctly argued that "possession is an equitable interest afforded protection by the automatic stay," *Id.* at 972:

> [T]he mere potentiality of a restoration of the landlord tenant relationship through vacatur of the warrant of eviction ... does not vest the debtor with a sufficient interest in the leased property to allow assumption and assignment of the lease.
>
> *Id.* (citations omitted).

**27.** She stated:

> This court is empowered to continue that stay, if the circumstances so require, to give the debtor a reasonable opportunity to re-

ever, she recognized, as had Judge Goettel in *GSVC, see* 10 B.R. at 302, that absent a revival of the landlord tenant relationship by the state court, the lease could not be assumed. *See* 49 B.R. at 972.

By contrast, in her 1992 decision in *Issa* (following her denial of a debtor motion to assume a lease, and shortly before considering the motion for a stay pending appeal, the opinion on which was reported), Judge Brozman lifted the automatic stay, *see* 142 B.R. at 76, declining to continue it to permit the debtor to pursue vacatur of the warrant in state court, because the debtor had already pursued such a remedy without success. *Id.* at 78. Distinguishing the facts in *W.A.S.*, Judge Brozman concluded in *Issa* that both the lease interest and the debtor's equitable interest had terminated, and observed that "at some point the estate's rights must expire." *Id.* at 75.[28]

In his 1997 decision in *Reinhardt*—a chapter 13 case involving a residential lease, where a warrant of eviction had been issued but execution had been stayed, conditioned on the Debtor paying rent arrears (which had not been paid, but which apparently still could be paid at the time of filing)—Judge Blackshear of this Court (citing, among other cases, *W.A.S.*) found it consistent with the purposes of chapter 13 to permit a cure of past due payments and thereby keep the right to possession alive. *See* 209 B.R. 183. He cautioned, however, after noting that "the landlord's interest in the property is of paramount importance to the Court and will be adequately protected to ensure against diminution," *id.* at 187, that protection against eviction for the debtor would be "condi-

tioned on fixed and steadfast repayment dates." *Id.* He further noted that "any further default by the debtor may result in the lease being immediately deemed rejected." *Id.*

Similar to *Issa* is the decision earlier this year of Chief Judge Stuart Bernstein of this Court, in *In re Hudson Transfer Group, Inc.*, 245 B.R. 456 (Bankr.S.D.N.Y. 2000). In that case too, the debtor had entered into a prepetition stipulation under which a warrant of eviction was issued, but where its execution was stayed to allow the debtor a time to pay rent arrears. If the debtor paid by the deadline, the warrant would be vacated and the lease reinstated. *Id.* at 457. However, the debtor did not pay, and just before the stay of execution of the eviction warrant would expire, filed a pro se corporate chapter 11 case. The case was subsequently converted to chapter 7; the chapter 7 trustee then sought to cure the defaults, and thereby reinstate the lease. *Id.* at 457–458.

While much of Judge Bernstein's opinion in *Hudson Transfer Group* dealt with the extent to which, under the authority of Code sections 108(b), section 365, and/or section 105(b), the trustee could obtain an extension of time to cure the defaults, Judge Bernstein necessarily also dealt with the underlying principles. He found, consistent with RPAPL § 749(3); the caselaw described above; and like authority in the Eastern District of New York,[29] that with the warrant of eviction having issued prior to the bankruptcy filing, the lease had terminated. *Id.* at 458. He further noted that a bankruptcy petition would not revive a terminated lease. *Id.*

negotiate with the landlord or to seek vacatur of the warrant of eviction.
*Id.* at 972.

**28.** Nevertheless, Judge Brozman granted a debtor motion for stay of her ruling—even though the debtor's argument in support of a debtor appeal was "of dubious validity," 142 B.R. at 78—as (1) the landlord did not oppose the motion and (2) the debtor would be irreparably harmed and the landlord would not be, because the relief she granted was condi-

tioned on the debtor's bringing the post petition rental arrearages current. *Id.*

**29.** *See In re Island Helicopters, Inc.*, 211 B.R. 453, 463 (Bankr.E.D.N.Y.1997) (Feller, J.) (noting the effect of RPAPL § 749(3), and further noting "[w]here a prepetition warrant of eviction has issued against a debtor, the law is clear that the subject lease terminated prior to bankruptcy and cannot be resurrected by the bankruptcy court").

Once having concluded, after his analysis of the statutory provisions relevant to the time to cure, that the trustee's cure period had lapsed, *id.* at 460, Judge Bernstein found no basis for staying the execution of the warrant of eviction.

Though the cases described above do not, after the issuance of a warrant, uniformly grant relief from the stay, on the one hand, or deny it, on the other, they are nevertheless consistent. They uniformly recognize the applicability of RPAPL § 749(3), and the principle that the issuance of a warrant of eviction, whether by order or stipulation, terminates the lease, subject to the power of the state court "to vacate such warrant for good cause shown prior to the execution thereof." They also make it clear that the filing of a bankruptcy case does not revive the lease, and that the bankruptcy court is not an appropriate forum for relitigating or otherwise negating matters that had been litigated, or agreed to, in state court.

The cases vary in their bottom lines by reason of factual distinctions—and in particular, the presence or absence of a basis for the Bankruptcy Court to conclude that bona fide litigation is pending in the state court (or may, with a reasonable likelihood of success, be brought there), or timely cure is still possible. Even then, the case-law (at least on the facts presented in the cases discussed above and the case at bar) does not sanction indefinite relief from the stay; rather, it suggests no more than a preservation of the status quo, and with adequate protection to the landlord (including, at the least, full and timely payment of postpetition rent), pending consideration by the state court of any fairly litigable issues.

Thus, where state court litigation under the escape valve provided under the second clause of RPAPL § 749(3) is pending, or the basis for good faith litigation is apparent (as it was in *W.A.S.*), a continuation of stay protection, at least for a limited time, may be appropriate. By contrast, where state court litigation is not pending or in the cards, or where the debtor has failed to show any basis for a belief that the state court will grant relief, the prepetition termination of the landlord-tenant relationship will at least normally provide cause for relief from the stay.[30]

Since, in all of the cases where this issue is presented, the lease will have already been terminated, by reason of the issuance of a warrant, under RPAPL § 749(3)—subject to the power of the state court to "to vacate such warrant for good cause shown prior to the execution thereof"—the issue faced by this Court is whether the Landlord should be denied its right to execute on the warrant of eviction by reason of that residual right that the RPAPL provides. Here this case is controlled by *Hudson Transfer Group*, where continuation of the automatic stay was denied under much less egregious facts. In this case, after repeated opportunities to cure the default by making payment, the Debtor's predecessor Garden One repeatedly failed to do so. Mr. Sloan, acting first through Garden One and now through this Debtor, has broken one promise after another. Indeed, even in this Court, the Debtor failed to make postpetition rent payments required under section 365(d)(3) of the Code and at this Court's express direction.

---

**30.** Exemplifying this distinction, in a recent case before this Court (where, after the issuance of a warrant of eviction, a cure payment had been delivered to the landlord and the check was returned to the tenant a few days later, because the landlord thought it could get a better deal by re-letting the premises), this Court continued the automatic stay for 30 days, to provide a time for the debtor to seek state court relief with respect to the refused tender, subject to earlier termination if the debtor did not file an application for such state court relief within 14 days. Continuation of the stay was premised, however, on this Court's view that where funds had been tendered to the landlord which the landlord refused, there was a bona fide basis for litigation in the state court. For the reasons set forth above, however, there is no basis for a like conclusion on the record here.

This is not a case of a refused tender, or other defense of the type that is pending or could be brought to bring this case under *W.A.S.;* the Debtor's only claim of a defense to the Bakery rent obligation is a counterclaim/defense that its predecessor, Garden One (likewise acting through Mr. Sloan) waived at least twice. On the facts of this case, there is no basis whatever for the exercise of any applicable power of this Court to protect the Debtor while it engages in further defaults and/or further delay, or to otherwise protect it from the termination of the Lease that has already resulted in state court. Cause for relief from the stay, on this first ground, has been shown.[31]

*"Cause" by Reason of Debtor Bad Faith and Conduct*

 As its second basis for "cause" for relief from the stay, the Landlord points to the lengthy history of abuse by Mr. Sloan in this case, leading to the order by Judge Bernstein prohibiting Garden One from again filing another petition, in any jurisdiction, and the imposition of sanctions; the Landlord argues, in substance, that the filing here was an effort to circumvent Judge Bernstein's ruling, to achieve the same prohibited effect, and was the latest in a series of wrongful acts. The Debtor's response is an assertion that the Assignment from Garden One to the Debtor was a bona fide one, for a business purpose; was not just an effort to circumvent the Judge Bernstein decision; and that, because he filed on behalf of a different corporation, the past events should not be attributed to this Debtor.

Here too the Court rejects the Debtor's contentions, both as not credible and contrary to the applicable law; it accepts the Landlord's argument that Mr. Sloan's conduct provides an additional basis for a finding of "cause" for relief from the stay.

 It is well settled, of course, that the filing of a bankruptcy petition on the eve of a foreclosure or eviction does not, by itself, establish a bad faith filing or "cause" for relief from the stay. *See, e.g., In re 234–6 West 22nd St. Corp.,* 214 B.R. 751, 757 (Bankr.S.D.N.Y.1997) (so noting). It is only one of several indicia that a court may appropriately look to in determining whether, under the totality of the circumstances, resort to the Bankruptcy Code has been in good faith, on the one hand, or inappropriate, on the other. But the Second Circuit has commented on the importance of resort to the bankruptcy laws of the United States in good faith:

> The good faith standard applied to bankruptcy petitions "furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy."

*In re C–TC 9th Ave. Partnership,* 113 F.3d 1304, 1310 (2d Cir.1997) (affirming dismissal of case, under Code 1112(b), for bad faith filing). For that reason, this Court considers it appropriate to focus on whether the Debtor and its principal have played by the rules; have met their obligations under the Bankruptcy Code; and have "done equity" when invoking the equitable protections the Bankruptcy Code provides.

 While each of Code sections 707(a), 1112(b), 1307(c) and 362(d)(1) states that the authority it provides—dismissal or relief from stay, respectively—may be granted for "cause," and lists one or more examples of cause, each precedes the list with the word "includes," and none of those lists is exhaustive. Cause, for either dismissal or relief from the stay, may be found based on unenumerated factors, including "bad faith," *see id.* at 1313, or

---

**31.** The Court does so fully recognizing the consequences to the Debtor and/or Mr. Sloan by reason of relief from the stay and the likely loss of the Lease and the Bakery, some or all of which may be regarded as irreparable.

Nevertheless, the law is clear in the respects described above, and Mr. Sloan need hardly be reminded of his numerous opportunities to cure, and avoid such consequences, even after the Judge Bernstein Decision.

failure to deal with creditors fairly even where "bad faith" is not found. *See In re Head,* 223 B.R. 648, 653 (Bankr.W.D.N.Y. 1998) (Kaplan, CJ) (dismissing chapter 11 and 13 cases for "non-enumerated" cause, by reason of unfair debtor practices). *See also In re Hudgins,* 188 B.R. 938, 946 (Bankr.E.D.Tex.1995) ("cause" under section 362(d)(1) is not limited to those situations where the property of a party lacks adequate protection; instead, "cause" "encompasses many different situations").

■ As Judge Brozman noted in *234–6 West 22nd Street* (wherein she granted relief from the stay, under section 362(d)(1), by reason of bad faith filing), "the standards for bad faith as evidence of cause," whether in the context of dismissal or relief from the stay, "are not substantively different from each other." 214 B.R. at 757; *see also In re Setzer,* 47 B.R. 340, 344 (Bankr.E.D.N.Y.1985) ("Bad faith has frequently been held to provide sufficient cause to warrant both types of relief").[32] She cautioned, in this connection, that the concept of bad faith filing should be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances. *Id.* She then continued:

> [W]hen faced with a motion to lift the stay on bad faith grounds, a judge must conduct a careful analysis similar to that performed with a motion to dismiss a case on bad faith grounds. In both cases, the relief sought is an extraordinary remedy that requires careful examination of the facts on a case-by-case basis. But where the circumstances require such relief, and the cases granting both types of motions are legion, a judge must not shrink from ordering it.

*Id.*

With full recognition of Judge Brozman's admonition that lifting the stay on bad faith grounds is an extraordinary remedy, this Court considers such relief to be appropriate here. Judge Bernstein dismissed Garden One's Bankruptcy Case # 3 for bad faith filing. Considering his analysis not as res judicata or for collateral estoppel, but merely on principles of stare decisis, his analysis is no less applicable here; as noted above, the requirements for "cause" for dismissal for bad faith filing, on the one hand, and for relief from the stay for bad faith filing, on the other, are not substantively different, and bad faith has frequently been held to provide sufficient cause to warrant both types of relief. The same bad faith that Judge Bernstein found to result in cause for section 1112(b) dismissal provides cause, as the above cases make clear, for relief from the stay under section 362(d)(1).

Of course, here we have additional facts which make the circumstances even more egregious. Judge Bernstein dismissed Garden One's chapter 11 case as a bad faith filing, prohibiting it from filing for any relief, under any chapter of the Code, in any district in the United States. Mr. Sloan's response to that order was not to appeal it, but to try to circumvent it. We now have efforts to sidestep an order of a federal judge, and forum shopping, to try again in another district, in addition to the events that Judge Bernstein found already constituted bad faith.

The Debtor's defense here is that Mr. Sloan's assignment technique was a valid means for once more securing bankruptcy protection. This Court disagrees, with respect to the legitimacy of purpose and the effect. If Mr. Sloan disagreed with Judge Bernstein's ruling, he had a remedy in the right to appeal; Mr. Sloan did not, however, have the right to circumvent that order, by a device to move the Lease he wanted to protect to another entity, and to repeat the bankruptcy process over again.

The technique the Debtor asks this Court to bless has sometimes been de-

---

**32.** With some foresight, the *Setzer* court added: "In view of the possibility of the filing of a new bankruptcy petition after a dismissal of a case, the lifting of the stay is often a more prudent course for creditors." *Id.*

scribed as the "new debtor syndrome." *See, e.g., In re Consulting Actuarial Partners,* 72 B.R. 821, 826 (Bankr.S.D.N.Y. 1987) (finding some, but not all, of the indicia of new debtor syndrome present, and denying dismissal for bad faith filing, determining that it was too early to conclude that the debtor was defunct and incapable of reorganizing); *In re Kinney,* 51 B.R. 840, 841 (Bankr.C.D.Cal.1985) (awarding sanctions for use of the technique); *In re Yukon Enterprises, Inc.,* 39 B.R. 919, 921 (Bankr.C.D.Cal.1984) (Russell, J.) (granting relief from the stay, for cause, for this reason); *In re Conquest Offshore International, Inc.,* 73 B.R. 171, 173 (Bankr.S.D.Miss.1986) (cited by Debtor; finding, on its facts, that filing there was not wrongful).

In *Consulting Actuarial Partners,* Judge Schwartzberg quoted a treatise, NORTON, BANKRUPTCY LAW & PRACTICE, in its description of characteristics of New Debtor Syndrome:

> Formation of a new entity for the purpose of filing a bankruptcy petition; foreclosure is threatening with respect to the assets in question; the only creditors affected are those threatening foreclosures; few, if any, unsecured creditors and no other creditors pressure; no ongoing operations or employees other than the controlling participants; no cash flow; the primary function of the debtor is to resist foreclosure as to the isolated assets held by the new debtors.

**33.** If the Debtor had assets other than those transferred from Garden One, the Debtor never identified them; while Mr. Sloan asserted in his testimony, in conclusory terms, that the Debtor had creditors other than those who were Garden One creditors, he never scheduled them, or otherwise identified any, and the only creditors identified in his filing were the creditors of Garden One; while he contended that the Debtor had employees, he failed to distinguish between those who were employees of the Debtor before the Assignment from Garden One, and those who were simply employees of Garden One who came with the Assignment; and he never showed how the Debtor had any assets, income, or

72 B.R. at 826–827. Judge Russell of the Central District of California provided a similar, but somewhat more refined, listing of "badges of bad faith" he had observed, including:

> (1) The transfer of distressed real property into a newly created or dormant entity, usually a partnership or corporation;
> (2) The transfer occurring within close proximity to the filing of the bankruptcy case;
> (3) No consideration being paid for the transferred property other than stock in the debtor;
> (4) The debtor having no assets other than the recently transferred, distressed property;
> (5) The debtor having no or minimal unsecured debts;
> (6) The debtor having no employees and no ongoing business; and
> (7) The debtor having no means, other than the transferred property, to service the debt on the property.

39 B.R. at 921; *accord In re Conquest Offshore International, supra* (the case cited by the Debtor).

The Debtor, contending that not all of those factors apply here, argues that it was entirely proper to use an assignment and filing by a new entity to circumvent the Judge Bernstein decision. The Court does not agree. First, this Court finds that all or virtually all of the attributes of new debtor syndrome are indeed present.[33]

other means to service the obligations on the Lease other than the transferred property. While the assumption of the liabilities of Garden One is at first blush different than an exchange for the stock of Garden One, it has at least much of the same economic substance, and is in stark contrast, for instance, to a payment of cash for them.

The Judge Bernstein Decision understandably dismissed Garden One's case notwithstanding creditors other than the Landlord; assets other than the Lease; and the apparent presence of employees. As the only showing of creditors, assets and employees in this record is that of those who were assigned over from Garden One along with the Lease, the Court

Second, it finds that certain of those indicia are extraordinarily obvious and blatant here, and are qualitatively highly significant—in particular, the Judge Bernstein Decision, prohibiting another bankruptcy filing by Garden One; the assignment from Garden One to the Debtor on the day the stay of the warrant of eviction expired; and the bankruptcy filing by the Debtor, a corporation which, on this record, was in fact dormant before the Assignment.

Judge Russell went on, however, to note that while the cases laying out those objective indicia of bad faith filing by reason of "new debtor syndrome" were very helpful, he believed that "a slightly different and more definite standard of bad faith is warranted." His approach, in this Court's view, gets to the jugular of the issue. He articulated a standard, which this Court considers quite useful, and applies here:

> This Court holds that once the creditor establishes that the transfer of the distressed property to the debtor was in close proximity to the filing of the case, a prima facie showing of bad faith has been shown, thus creating a rebuttable presumption of bad faith. The burden, thereafter, is on the debtor to establish good and sufficient reasons why the relief should not be granted.[34]

39 B.R. at 921. He went on to hold:

> If, in addition to the prima facie showing of bad faith, the creditor proves that its substantive or procedural rights have been adversely affected by the transfer and filing, "cause" is established pursuant to 11 U.S.C. § 362(d)(1) and the Court must lift the stay.

Id. at 921–922.

Here the transfer of the Lease was in extraordinarily close proximity to the fil-

ing—the day before—and there was no apparent reason for the Assignment, particularly at that time, except for the difficulties with the Landlord. Likewise, it is obvious that the Landlord's substantive and procedural rights have indeed been adversely affected by the transfer and filing. The Landlord had a legitimate basis to expect that the orders of the New York City Civil Court, and Judge Bernstein, would be honored. Those of the New York City Civil Court, unless and until vacated or modified by that court or a higher court, were entitled to respect. Until and unless modified by Judge Bernstein or a higher court, so were those of Judge Bernstein. No one would seriously contend, this Court believes, that Garden One could file a fourth time, in the face of the Judge Bernstein Decision, and this Court is unwilling to accept the notion, particularly with the benefit of Yukon, that an eleventh-hour assignment to the Debtor changes that result.

The Court believes, and holds, that (a) bad faith filing; and (b) a calculated effort to circumvent the earlier order of a federal bankruptcy judge (which had previously attempted to respond to efforts to invoke the stay) each separately provide "cause" for relief from the stay. Where, as here, they exist in combination, "cause" even more plainly exists. Section 362(d)(1) relief, for cause, is granted for this reason as well.

*Change of Venue*

A motion for a change of venue to transfer a bankruptcy case is governed by 28 U.S.C. § 1412. Pursuant to § 1412:

> A district court may transfer a case or proceeding under title 11 to a district

---

finds it inappropriate to find their presence as validating this filing. Likewise, if the Debtor was truly in need of bankruptcy relief on its own, the Court finds it odd that with Mr. Sloan's track record of filing bankruptcy petitions, a bankruptcy petition was filed only at this time; rather, the Court accepts, and finds of great relevance, the Debtor's admission in its Local Rule 1007-2 affidavit that "its finan-

cial difficulties arise mainly due to the Landlord."

**34.** He continued that "[a]lthough close proximity is not an exact term, it is clearly present in this case and this Court is confident most people will know it when they see it." 39 B.R. at 921. Here, where the proximity is one day, that is hardly an issue.

court for another district, in the interest of justice or for the convenience of the parties.[35]

The statute imposes a common standard for the transfer of a case (the subject of the motion here) and a proceeding, such as an adversary proceeding, brought under the umbrella of the underlying case.

Rule 1014(a) of the Federal Rules of Bankruptcy Procedure (which deals only with the transfer of a case) imposes a similar standard. It provides, in relevant part:

> (1) Cases Filed in Proper District. If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.[36]

■■■■ The party moving for change of venue, here the Landlord, bears the burden of proof, and that burden must be carried out by a preponderance of the evidence. *See In re Manville Forest Products Corporation,* 896 F.2d 1384, 1390 (2d Cir.1990) (in context of transfer of adversary proceeding); *In re Vienna Park Properties,* 125 B.R. 84, 87 (S.D.N.Y.1991) (in context of transfer of case). The Court concludes that the Landlord has met this burden.

■■■■ A motion for a § 1412 transfer is within the discretionary authority of the court, *see Manville Forest Products,* 896 F.2d. at 1391 (explicitly so stating, in adversary proceeding context),[37] and is made after "individualized, case-by-case consid-

eration of convenience and fairness." *Id.* The Second Circuit has given the Bankruptcy Courts guidance in this regard:

> The "interest of justice" component of § 1412 is a broad and flexible standard which must be applied on a case-by-case basis. It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness....

*Id.*

■■■ To assist in gauging "convenience of witnesses" and "interests of justice," some relatively objective factors have been considered: (1) proximity of creditors; (2) proximity of the debtor; (3) proximity of witnesses necessary to the administration of the estate; (4) location of assets; (5) economic administration of the estate; and, in some of the cases, the necessity for ancillary administration in the event of liquidation. *See Vienna Park Properties, supra,* 125 B.R. at 86 n. 1 (S.D.N.Y.1991) (listing all six); *In re Hadar Leasing International Co., Inc.,* 14 B.R. 819, 820 (S.D.N.Y.1981) (listing the first five). In another case, Judge Schwartzberg of this court articulated the factors slightly differently, though to the same general effect, adding as additional relevant factors the relative harm to the debtors and creditors caused by the transfer; the effect on the parties and their willingness or ability to participate in the case or in adversary proceedings; and the availability of compulsory process and the cost associated with the attendance of unwilling witnesses. *See In re Greenhaven Associates, Ltd.,* 93 B.R. 35, 40 (Bankr.S.D.N.Y.1988).

---

**35.** Where, as here, the District Court has referred all bankruptcy cases to bankruptcy courts like this one, this court exercises that power.

**36.** As noted in footnote 15 above, the Court assumes, without deciding, that the Southern District of New York was a proper district under 28 U.S.C. § 1408, and proceeds instead under 28 U.S.C. § 1412.

**37.** Section 1412, by its terms, covers the transfer of both cases and adversary proceedings. While it is conceivable that facts might have varying relevance, depending on whether it is a case or a proceeding to be transferred, the statutory criteria are the same for both.

■ To the extent these factors are applicable here,[38] the balance tips slightly in favor of the Eastern District. For instance, the Landlord's counsel is correct in noting that by reason of the locale of the Debtor's assets, its principal place of business, the place of its operations, and the locale of creditors and potential witnesses, this case has a stronger nexus to the Eastern District than it does to the Southern District.

But this Court considers it more meaningful under the facts of this case, particularly where some of the factors are nearly in equipoise, to consider more abstract measures of the "interests of justice." Where, as here, a case is filed in one district where virtually all of the events leading up to the case took place in proceedings before a judge in another district; where files and exhibits are likely to be more readily available in the other district; and where a judge in the other district considered matters relevant to this case as recently as four weeks prior to the filing here, principles of judicial efficiency and comity for the first district lead the Court to conclude that it is better for this case too to be heard there, or at least as much of it as practical.[39]

The Court considers that the interests of justice also warrant transfer for another reason. The Court has found as a fact that this case was filed in the Southern District for "forum shopping"—to try out the Southern District, after repeated unfavorable rulings, and a restrictive order, in the Eastern District. The interests of justice require that this Court not reward such an effort. This Court believes it appropriate to add as an additional relevant factor, though it may rarely be applicable, the integrity of the Bankruptcy Court system.

The matters set forth in the two preceding paragraphs are particularly responsive, in the Court's view, to the Second Circuit's direction that Bankruptcy Courts consider "the efficient administration of the bankruptcy estate," "judicial economy," and "fairness." For the foregoing reasons, this aspect too of the Landlord's motion will be granted, and this case will be transferred to the Eastern District of New York.[40]

### Conclusion

Both prongs of the Landlord's motion are granted. The Landlord will have relief from the automatic stay,[41] effective 5:00 p.m. November 9, 2000,[42] and this case will

38. In some respects, the choice between the Southern and Eastern Districts of New York is largely a wash; the Court has found that the Eastern District is neither materially more convenient to creditors nor materially less so. Certainly, the Eastern District, where Mr. Sloan three times filed on behalf of his corporation Garden One, is no less convenient to him.

39. The Court adds the latter qualification because it determined that fairness to the Landlord required hearing the Landlord's motion for relief from the stay as early as possible—a goal that would be difficult to achieve if consideration of that motion had to await transfer.

40. The Court will provide a copy of this decision to the Hon. Conrad Duberstein, Chief Judge of the Eastern District of New York and Judge Bernstein, with a recommendation that this case be assigned to Judge Bernstein of that court. Needless to say, any such recommendation is not binding on Judge Duberstein and Judge Bernstein.

41. In connection with its request for section 362(d)(1) stay relief, the Landlord also requests that this Court authorize and direct the United States Marshal to assist it in recovering possession. While this Court regards such relief as appropriate only in extraordinary circumstances, it is satisfied, on the egregious facts here, that in light of Mr. Sloan's history of repeat filings; disregard of court orders; and efforts to circumvent court orders, it should grant such relief in substantial part, and it will authorize the United States Marshal to so act.

42. As it is authorized to do, the Court "orders otherwise" with respect to the 10-day stay of its ruling which otherwise would be applicable under Bankruptcy Rule 4001(a)(3). With the "bouncing" of the Debtor's check for postpetition rent, which was to provide the Landlord with a modicum of adequate protection for any delay in recovering possession, the additional 10-day delay would subject the Landlord to even greater prejudice, and the Debtor's entitlement to the stay of effective-

be transferred to the Eastern District of New York. The Clerk of this Court is authorized and requested to take such steps in coordination with the Eastern District as are appropriate to implement the transfer.

SO ORDERED.

ness for which Rule 4001(a)(3) normally provides, which is essentially an equitable remedy, is barred by the Debtor's unclean hands. The Court grants a stay of its ruling to the extent, but only the extent, of three business days, to permit an application for a stay pending appeal.