## In re BARRINGTON SPRING HOUSE, LLC, Debtor.

## In re Geoffrey W. Edelsten, Debtor.

## In re N770GE, LLC, Debtor.

Nos. 14–30054, 14–30055, 14–30056.

United States Bankruptcy Court,
S.D. Ohio,
Western Division,
at Dayton.

Signed April 11, 2014.

James A. Coutinho, Strip Hoppers Leithart McGrath & Terlec, Columbus, OH, Myron N. Terlecky, Columbus, OH, for Barrington Spring House, LLC, Debtor–in–Possession.

Gregory T. Engler, John Paul Rieser, Dayton, OH, for Trustee.

Mary Anne Wilsbacher, USDOJ—Office of the U.S. Trustee, Columbus, OH, for U.S.Trustee.

J. Matthew Fisher, Allen, Kuehnle Stovall & Neuman LLP, Columbus, OH, for Geoffrey W. Edelsten, N770GE, LLC, Debtors–in–Possession.

Ronna Govan Jackson, Office of the United States Trustee, Cincinnati, OH, for Daniel M. McDermott, U.S. Trustee.

## OMNIBUS DECISION TRANSFERRING VENUE OF CASE NO. 14–30055 AND CASE NO. 14–30056 AND MAKING OTHER DETERMINATIONS ON EIGHT MOTIONS

LAWRENCE S. WALTER, Bankruptcy Judge.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and the standing General Order of Reference in this District. The matters before the court are core proceedings pursuant to 28 U.S.C. Section 157(b). *See Bavelis v. Doukas (In re Bavelis)*, 453 B.R. 832, 845 (Bankr.S.D.Ohio 2011) (regarding motions to transfer venue).

Before the court are eight motions pertaining to three separate but related Chapter 11 cases as follows:

Case No. 14–30054—Barrington Spring House, LLC

Mawardi Motion to Procedurally Consolidate/Motion to Transfer Venue (doc. 21, 35)

Case No. 14–30055—Geoffrey W. Edelsten

Mawardi Motion to Procedurally Consolidate/Motion to Transfer Venue (doc. 13, 22)

Mawardi Motion to Convert to Chapter 7 (doc. 19)

Mawardi Motion for Limited Relief from Stay (doc. 21)

UST Motion for Appointment of Examiner (doc. 56)

Case No. 14–30056—N770GE, LLC

Mawardi Motion to Procedurally Consolidate/Motion to Transfer Venue (doc. 11)

Mawardi Motion to Dismiss or Convert to Chapter 7 (doc. 14) Debtor Emergency Motion to Enforce the Automatic Stay (doc. 23)

Responsive objections and memoranda in opposition were filed with respect to each motion. Because the motions have many facts and issues in common, the court conducted a two-day consolidated evidentiary hearing beginning on February 12, 2014. Closing arguments were submitted in writing subsequent to the hearing. The court has carefully considered all of the filings, the entire record in each of the cases, the testimony of the witnesses, the arguments of counsel, and the many exhibits admitted into evidence and is now ready to render its decision.

## FACTUAL BACKGROUND

### Introduction

All three Chapter 11 cases were precipitated by a long-term dispute between Geoffrey W. Edelsten ("Edelsten") and the Mawardi family, consisting of Rafael ("Mr. Mawardi") and Limor Mawardi and their son Isaac Keith Mawardi (the "Mawardis" aggregately). Each of the bankruptcy petitions was filed by Edelsten on January 9, 2014, the day before a significant hearing was scheduled in a Florida state court case between the parties.

The primary case in terms of assets and decisional authority is that of Edelsten, a citizen of Australia, who is directly or indirectly the sole member and owner of the other two debtors which are limited liability companies.[1] One of these debtors is Barrington Spring House, LLC ("Barrington"), an Ohio limited liability company solely owned by Altels Management LLC, a Florida limited liability company which is solely owned by Edelsten. Barrington is a single asset real estate case involving a distressed apartment complex in Dayton, Ohio. That case is currently under the control of a Chapter 11 trustee.

The other case is that of N770GE, LLC ("NG"), a Delaware limited liability company,[2] solely owned by Edelsten. This debtor originally owned a single asset, a private aircraft. Because the aircraft was sold, the debtor's assets now consist of potential avoidance claims and the net proceeds of the aircraft sale amounting to $1,100,212.33 currently residing in the trust account of the Mawardis' attorney in Florida.

All but one of the motions under consideration were either filed by or pertained to the Mawardis who are among the largest

---

1. Edelsten's sole ownership of various properties, including these limited liability companies was disputed by the Mawardis who claim that Edelsten unilaterally doctored official state records to remove the Mawardis from part ownership. Edelsten in turn accuses the Mawardis of the same impropriety. Nevertheless, the Mawardis have acquiesced to Edelsten's ownership and consequent authority to file these bankruptcy cases in reliance on a disputed "settlement agreement" which ratified that ownership.

2. The Mawardis allege that the sole asset of NG, an aircraft, was originally owned by N770GE, LLC, a Delaware limited liability company, but was then transferred and titled in a Nevada limited liability company of the same name. However, the corporate resolution filed by the debtor in this case states that it is a Delaware company. In this decision, the court will assume that the corporate resolution is correct and will refer to NG as a Delaware entity, but makes no final determination on the matter.

creditors in each case. The other motion, requesting appointment of an examiner, was filed by the United States Trustee, and was largely based on allegations raised by the Mawardis.

### Pre–Bankruptcy Joint Venture

These three related bankruptcy cases were precipitated by the dispute between the Mawardis and Edelsten stemming from their joint business ventures. The early weeks of these bankruptcy cases have been dominated by that dispute. Much of the testimony and documentary evidence elicited at the hearing pertained to the history of their prior business dealings and their subsequent falling out.

Edelsten is a former medical doctor who resides in Australia. He has been involved in numerous business ventures, but made the bulk of his fortune though the operation of a chain of medical clinics in Australia which was eventually sold with a net return to Edelsten of approximately $28 million. Other than his ventures with the Mawardis, his investments include or have included the following: real estate in Australia, coal and mineral sands in Indonesia, various medical-related enterprises, a fleet of rare expensive automobiles, and intellectual property referred to as "grey water." His involvement with the Mawardis expanded his investments, particularly in the United States and the Dominican Republic.

Edelsten and his wife were regular customers of the Mawardis' Nurielle fashion shop in Las Vegas beginning in 2009 and into 2011. Their frequent and substantial patronage of the shop led to a friendly relationship between the two families. In fact, Mr. Mawardi and Edelsten became such close friends and confidants they decided to enter into a joint venture to expand the Nurielle fashion brand and stores to major cities throughout the world. They formalized their arrangement in a Joint Venture Agreement executed in July of 2011. The joint venture, to be known as House of Nurielle, was for the purpose of "operating a men's and women's fashion business including the opening of retail locations in cities around the world." [Ex. 1] Generally, Mr. Mawardi was to provide his retail expertise together with all assets associated with the Nurielle brand and Edelsten was to provide operating capital. Their joint investment activities soon exceeded the specified scope of the Joint Venture Agreement to include the purchase and development of casino properties in the Dominican Republic, purchase and customization of a private aircraft, purchase and attempted rehabilitation of apartment complexes in Dayton, Ohio and Memphis, Tennessee, and investment in a few other miscellaneous enterprises.[3] The Nurielle assets plus all other joint business properties of Edelsten and the Mawardis will be referred to herein aggregately as the "Venture Properties."

Mr. Mawardi's son, Isaac Keith Mawardi, was a nominal participant and signatory to many of these financial ventures, but had no real involvement or investment. Most of the money related to the ventures flowed into and out of a trust fund set up in Isaac's name, referred to by the parties as the Militzok Trust (referencing the attorney who established the trust). In April of 2012, Mr. Mawardi had the official state records for most of the Edelsten/Ma-

---

**3.** There was to be a third investor in the Ohio and Tennessee ventures. David Levy was to purchase a 14% interest in each enterprise but purportedly failed to make the payment thereby leaving Mr. Mawardi and Edelsten holding equal 43% interests. Mr. Levy, a Florida resident, was a defendant in the Florida Lawsuit and a party to the Settlement Agreement (discussed later in this decision). According to Mr. Mawardi, Mr. Levy is also a party to the insurance claim litigation pending in a federal court in Florida.

wardi business entities amended to substitute Isaac for Edelsten as a member and owner.[4] The parties hotly contest whether Edelsten approved of this change, but Mr. Mawardi's explanation is the most plausible. He explained that the ownership change was, at least to his mind, a change of form and not substance, merely a strategy suggested by Edelsten to obtain financing in the United States by substituting Isaac, a U.S. citizen, for Edelsten, a non-citizen. There is no documentation to support this explanation, but it is consistent with the parties' penchant for "off the books" transactions. The practice was so familiar, that Edelsten joked in an April 16, 2012 email message to Mr. Mawardi, "Was there no Schwartz for last month?" [Ex. 54] As explained by Edelsten at the hearing, a "schwartz" is a term for "money to be kept from tax declarations." [Transcript of Hearing Held Feb. 12–13, 2014 ("Tr."), 376].

The Mawardis, who lived in Florida and manufactured their clothing and otherwise ran their business ventures from there, had been experiencing some financial difficulties starting in 2008. At one time, they operated ten stores in Nevada and Florida, but had only the single Las Vegas store by 2010. The Las Vegas operation had a net loss in 2009 and 2010 and Limor Mawardi filed personal bankruptcy in 2010 stating in her schedules that her income combined with Mr. Mawardi's was just over $6,000.00 per month. Although Edelsten testified at one point that he was unaware of the Mawardis' financial problems when he entered into the joint venture, he later testified that "I knew he [Mr. Mawardi] didn't have it [money]." [Tr., 466].

The Mawardi's business headquarters was located at 4142 North 28 Terrace, Hollywood, Florida. That address also became the headquarters and mailing address for all the Venture Property businesses and the place where Edelsten maintained his U.S. office. Over time, Edelsten contributed several million dollars into the joint ventures with the Mawardis. However, the Nurielle expansion was unsuccessful and other investments required additional infusions of money. At some point, Edelsten became concerned about the unprofitability of the Venture Properties and the continued requests for funding by Mr. Mawardi. To enable further development of the Dominican Republic casino properties, he induced Mr. Mawardi to obtain a short term substantial loan (perhaps exceeding $1 million) at a high interest rate from Liron Ben–Shimon.[5] When anticipated funds were not received from Edelsten, the Mawardis also contributed family funds in an attempt to keep the Las Vegas shop and other ventures viable.

Things came to a head in September of 2012 when Edelsten demanded an accounting and flew to Florida with his lawyer, accountant, and other associates for a meeting with the Mawardis. Other than miscommunication and recriminations, it is unclear what transpired at the meeting, but the immediate result was a lawsuit filed by the Mawardis in the Circuit Court for the Seventeenth Judicial District, Broward County, Florida against Edelsten, David Levy, and all of the entities associated with the joint venture, including Bar-

---

4. Mr. Mawardi also contends that Edelsten subsequently and without authority amended all of the state records to remove the Mawardis and substitute himself as sole owner of these same entities.

5. Mr. Mawardi testified that he was attacked and knifed by an agent of Mr. Ben–Shiron due to his failure to repay the loan. There is also a pending lawsuit filed in Florida by Mr. Ben–Shiron against Mr. Mawardi and Edelsten.

rington Spring House, LLC and N770GE, LLC ("Florida Lawsuit").

### Pre–Bankruptcy Litigation

In the Florida Lawsuit, the Mawardis stated a variety of claims such as breach of contract, fraud, and various intentional torts, but essentially asserted that Edelsten had acted inappropriately to deprive the Mawardis of their interests in the Venture Properties. Based upon the court orders admitted into evidence pertaining to the Florida Lawsuit and a related federal lawsuit, the litigation between the parties was extraordinarily acrimonious and hostile. In particular, the conduct of Edelsten and his various counsel was at times in bad faith and contemptuous of the state court's orders. Sanctions were frequently threatened or imposed. Following is an abbreviated recitation of these activities.

A few days after the filing of the Florida Lawsuit, Edelsten filed his own complaint against the Mawardis in the Federal District Court for the Southern District of Florida containing claims and issues roughly duplicative of those already pending in the Florida Lawsuit. Edelsten also filed an Emergency Motion for Preliminary Injunction which precipitated a hearing on Rosh Hashanah, causing hardship for the Mawardis who are observant Jews. Edelsten's attorneys, particularly Christopher Robbins, did not inform the federal court of the pending Florida Lawsuit and did not appear at the emergency hearing, instead sending an ill-informed and inexperienced young associate. Edelsten also failed to appear at the hearing. The result was that Edelsten's counsel was sanctioned more than $40,000.00 and the federal case was dismissed.[6]

During the course of the Florida Lawsuit, amid allegations by the Mawardis that Edelsten was taking unilateral actions to usurp, sell, encumber or lay waste to the Venture Properties, the state court issued orders forbidding any sale, encumbrance or hypothecation of the subject personal or real property. The court noted that the discord between the parties was jeopardizing recovery on an insurance claim for the Memphis property; that Edelsten had caused or permitted recordation of a mortgage on the Dayton property without agreement of the Mawardis; and that an ownership dispute persisted as to three parcels of real estate in Hollywood, Florida. Subsequently, on June 10, 2013 the court ordered the appointment of a receiver to handle the insurance claim of Investments Australia, LLC (the Memphis property). Likewise, it appointed a receiver for Altels Management, LLC (the Dayton property) to maintain the property and ensure that no further encumbrances or transfers would take place.

The mortgage executed by Edelsten on October 16, 2012 on the Dayton property without the Mawardis' consent or knowledge was granted to an Australian company named Highgate Road Pty., Ltd. which was wholly owned by Lindsey Hoskins, Edelsten's long-standing business accountant.[7] The mortgage was to secure Edelsten's personal obligation of $3,879,000.00 to purchase part of Mr. Hoskin's tax and financial planning business. No funds were received by Edelsten, Altels, or Barrington in consideration for the mortgage. Shortly after the appointment of the receiver for the Dayton property, Highgate filed a complaint in Ohio to foreclose its

---

6. In Edelsten's filed Statement of Financial Affairs, he lists the case as "pending."

7. Similarly, according to Mr. Mawardi's testimony, Edelsten granted an unauthorized $2 million mortgage on the Investments Australia, LLC property in Memphis to Edelsten's business associate, Alan Kwan, also without consideration.

mortgage on the property. Although Edelsten testified that the foreclosure filing was a surprise to him, it is not credible that his trusted corporate accountant would take such an action without the complicity of Edelsten. Understandably, this sequence of events suggested to the Mawardis and to the Florida state judge a blatant and contemptuous violation of the court's orders orchestrated by Edelsten. A hearing to show cause why Edelsten should not be held in indirect criminal contempt was consequently scheduled for January 30, 2014 in the Florida court.

### The Settlement Agreement

On September 10, 2013, the parties to the Florida Lawsuit (Edelsten, the Mawardis, and David Levy) executed a comprehensive settlement agreement ("Settlement Agreement") intended to resolve "any and all disputes between them, including, but not limited to, those brought" in the Florida Lawsuit. [Ex. 31]. The agreement purported to contain all "material" terms while at the same time anticipating a period of due diligence and execution of a more formal agreement. The agreement generally sorted out the ownership and rights to the Venture Properties, variously transferring or confirming ownership, requiring monetary payments, and mandating the release or recording of liens to secure performance. The state court in the Florida Lawsuit was to retain jurisdiction to enforce the Settlement Agreement.

Problems with implementation of the agreement began almost immediately. On September 12, 2013, the Mawardis filed the first of seven motions in the Florida Litigation to enforce the Settlement Agreement and/or for a finding of contempt against Edelsten. Hearings were held; orders were entered. Apparently, Edelsten did not appear personally at most or all of the scheduled hearings. The chronological detail of what occurred is recited in the Florida court's findings of fact in its Omnibus Order Granting Motions to Enforce Settlement Agreement and for Contempt ("Omnibus Order") entered on December 19, 2013. [Ex. 14]. That recitation need not be repeated here, but the court's judgment following a hearing on December 17, 2013 as stated in the Omnibus Order explicitly concluded among other things that Edelsten had materially violated several of the court's orders, that the Mawardis were entitled to reimbursement of their attorney fees and costs, and that Edelsten would be subject to arrest and possible criminal prosecution if he failed to comply with the court's latest order. Subsequently, the court set an evidentiary hearing on January 10, 2014 to hear Edelsten's claimed setoffs under the Settlement Agreement and also to hear various motions filed by the Mawardis. Edelsten, Barrington, and NG filed their bankruptcy petitions in Ohio on January 9, 2014, the day before the hearing was to commence.

### The Bankruptcy Estates

*Barrington Spring House, LLC, Case No. 14–30054.* Notwithstanding the statements in the bankruptcy petition and corporate resolution filed at the outset of this case, Edelsten is not the direct owner of Barrington. As evidenced by the Amended list of Equity Security Holders (doc. 47) and the Supplemental Corporate Resolution (doc. 46), both filed on January 20, 2014, Barrington, which is an Ohio LLC, is owned entirely by Altels Management, LLC. Altels is a Florida entity owned by Edelsten. Barrington is a single asset real estate case and its primary asset is the residential apartment complex known as Riverside Park Apartments in Dayton, Ohio.

Based upon testimony at a hearing held in this court on January 22, 2014, upon filing its bankruptcy case, Barrington had

no liability insurance coverage on the apartment complex, its occupancy was less than 12%, and it had insufficient operating funds to ensure the continued safety of the residents or the viability of the complex as a business enterprise. As a result, a Chapter 11 trustee was appointed and short term financing was approved so that insurance could be obtained. The court also ordered that tenants be given reasonable notice to vacate and that the premises be closed and secured. As of the bankruptcy court hearing on February 12, 2014, occupancy had decreased, vandalism and theft were rampant, and the enterprise was desperately short of cash. A motion to approve sale of the real estate is currently pending before the court. In addition to a tax lien of over $300,000.00, both Highgate Road Pty., Ltd. and the Mawardis hold disputed mortgage liens. There are numerous unsecured creditors, with service providers and tenant security deposit claimants located in Ohio predominating.

*N770GE, LLC, Case No. 14–30056.* As noted earlier, N770GE, LLC ("NG") is a Delaware limited liability company, solely owned by Edelsten. It was originally a Venture Property which owned a private aircraft initially intended to serve the needs of the Mawardis and Edelsten as they administered to their Nurielle holdings. At the time of the bankruptcy filing, the airplane had been sold and the only asset of NG was $1,100,212.33 residing in the trust account of the Mawardis' Florida attorney plus potential avoidance actions to recover additional funds held by others. Of $6,053,334.70 scheduled unsecured debt, Edelsten's claim of $6,000,000.00 predominates. None of the creditors are located in Ohio. The claimed equitable lien of the Mawardis is scheduled as "unknown." The Mawardis currently assert a right to immediate payment of the trust account funds pursuant to an order of the Florida state court, a claim resisted by the Debtor pursuant to an Emergency Motion to Enforce the Automatic Stay (doc. 23).

*Geoffrey W. Edelsten, Case No. 14–30055.* At this point in his bankruptcy case, the extent and value of Edelsten's assets remains unclear. His original bankruptcy schedules require supplementation and he has ascribed no value to many of his holdings. He separately lists with value "unknown" 25 Australian proprietary limited companies, 13 U.S. entities (mostly limited liability companies), and 5 S.R.L entities, presumably formed under the laws of the Dominican Republic. Two of the listed entities are debtors in the related bankruptcies, Barrington Spring House, LLC and N770GE, LLC.

Edelsten's prepetition financial statement dated April 5, 2012, prepared for submission to a bank, indicated a net worth of nearly $59 million and Mr. Mawardi testified that Edelsten had significant undisclosed assets including many millions of dollars transferred to relatives and associates. Edelsten testified that he had lost many millions of dollars in the joint venture with the Mawardis and through other bad investments and that he had liquidated many of his hard assets. He further testified that he believed himself to be currently solvent, but only to the extent of perhaps $1 million.

Missing from his schedules are several Florida assets attributed to him by Mr. Mawardi. According to Mr. Mawardi, Edelsten has a stake in the insurance claim related to fire damage at the Investments Australia, LLC property in Memphis. That claim, valued by Mr. Mawardi at between $9 million and $10 million, is the subject of a pending federal lawsuit in Miami and is also verified by the Settlement Agreement which acknowledges Edelsten's 100% ownership of the LLC,

his obligation to pursue the claim and be reimbursed for his costs and attorney fees, and his right to receive 43% of any recovery. Also, there were several Florida real estate interests shown on Edelsten's financial statement, ownership of which had been in dispute during the Florida Litigation. According to the Settlement Agreement, all of these properties were to be transferred to Mr. Mawardi and any claims by Edelsten to them were to have been released. Based upon Mr. Mawardi's uncontroverted but inconclusive testimony, it appears that these properties were not transferred and Edelsten may still own or have claims to them.

Thus far, Edelsten has listed 3 secured creditors (two mortgages held by Australian banks and one held by his mother), 1 priority tax creditor for Australian taxes, and 38 unsecured creditors of which 15 are located in the United States. Of his 20 largest unsecured creditors, 10 are located in Florida (mostly related to the litigation there or the ventures with the Mawardis), 5 are in Australia, 2 are in the Dominican Republic (most likely related to the Casino investment with the Mawardis), 1 is in Colorado (apparently related to Investments Australia, LLC, another Venture Property), and the other two are in Indiana and Singapore.

### Credibility

The primary witnesses at the hearing were Rafael and Limor Mawardi and Geoffrey Edelsten. Due at least in part to their longstanding animosity and pre-petition acrimonious litigation in state court, their testimony was not entirely credible. Each side's version of the truth tended to omit disadvantageous facts while stridently advancing a narrative portraying themselves as victims of the other side's malfeasance.

Mr. Mawardi was extremely uncooperative and argumentative on cross-examination and had to be cautioned repeatedly. Mrs. Mawardi, while seemingly candid and truthful in her testimony, admitted to the nondisclosure of significant business assets in her own personal bankruptcy filed in 2010, thereby calling into question her veracity on other matters.

Edelsten was generally cooperative albeit evasive at times, but his credibility as to the location, ownership, and source of his funds and assets was greatly diminished due to his business practices and self-serving memory or lack of memory.[8] His practice is to hold assets in discrete limited liability companies and trusts, most of which he controls personally or through surrogates such as his mother, lawyer, accountant, or business associates. He regards all of the assets as his own to do with as he pleases, but interposes the separate legal business entity structure when convenient or claims to know nothing because one of his surrogates handles such matters. Similarly, he is self-servingly ambiguous about whether he or one of his entities is the borrower or lender in a transaction and whether a particular transfer of funds constitutes a loan, capital contribution, or gift.

These practices are pervasive and generally consist of opportunistic manipulation of facts and circumstances—a sort of multi-faceted shell game—to achieve some advantage for Edelsten and corresponding disadvantage for his opponents, such as the Mawardis in this instance. This "shell

---

**8.** Certain background facts, while not determinative, suggest that Edelsten has in the past had a propensity for prevarication. In 1990 he was convicted in Australia of perverting the course of justice and for soliciting an agent to assault another person. Also, Edelsten admits that the judge in a 2012 lawsuit (Edelsten et al. vs. Stacy da Silva) referred to Edelsten (and also his opponent) as a perjurer.

game" not only undermines Edelsten's credibility, but also impacts the court's understanding of this case and its ultimate determinations on the pending motions. Therefore, further explanation and detail are warranted. Examples are helpful, but it is the entire fabric of his testimony, with all the nuances and intonations, that creates a vivid impression that nothing is certain and assets and liabilities are always in flux.

### Edelsten's "Shell Game": Manipulation of His Business Interests through LLCs and Surrogates

First, there is the problem of asset attribution: who owns what and when was it acquired or transferred? As noted, Edelsten holds assets in trusts or business entities, usually limited liability companies or their foreign equivalent. Mr. Mawardi also testified that Edelsten has many hidden assets, including funds held by his mother and associates, which, while seemingly plausible, lacks confirming evidence. Edelsten's schedules reveal 33 such business entities and one trust, Norman South Discretionary Trust.[9] All are listed with "unknown" value and the assets held by each are also largely unknown at this time.[10] There are numerous examples of how Edelsten avoids definitive statements about his assets and transactions and instead provides qualified answers for which he cannot be held accountable. In the following quote from the hearing transcript, Edelsten responds to a question about trust assets in a vague manner, as if the trust does not pertain to him at all:

Q. Do you have an interest in any trust other than the Norman South Trust, equitable or otherwise?

A. I think there is a trust named Betsy, but I don't recall that it's received any income or expenditure, et cetera, or whether it's ever been used, but that's the only one that I've ever heard of.

[Tr., 479].

Even his response to a question about his ownership of NG is not definitive:

Q. And the LLC, who's the manager and member of that LLC, NG770GE?

A. I'm uncertain, but I believe that I am.

[Tr., 413].

Perhaps the most concrete example of shifting asset attribution is Edelsten's financial statement of April 5, 2012 and his testimony regarding it. He emailed the financial statement to Mr. Mawardi on April 16, 2012 and states in the email message that the statement was prepared for "our bank." [Ex. 54]. The statement makes no distinction between his personal assets and those of his primary trust or any other entity, but reveals a personal net worth of approximately $59 million. Implicit in the email is that the financial statement was to be relied upon by the bank in extending credit to Edelsten. When cross-examined by counsel for the United States Trustee, however, Edelsten attempts to recharacterize the statement while at the same time inadvertently ad-

---

9. Edelsten also owns a business entity named Norman South Pty. Ltd. which may or may not currently have assets. At times during the hearing, there was confusion as to whether references to "Norman South" pertained to the trust or the business entity. Also, at least two other trusts were mentioned during testimony. Edelsten acknowledged having a trust entitled "Betsy." There was also the Militzok Trust in Isaac Mawardi's name used by Edel- sten and Mr. Mawardi to distribute funds to their various Venture Properties.

10. Four weeks after the hearing, Edelsten filed a supplemental document containing some additional information about the entities in which he has an interest. However, this information is not in evidence and is far from complete.

mitting that his financial representations change depending upon his objectives:

Q. Okay. I just have one other question. Do you recall your testimony regarding a balance sheet that was shown to you by Mr. Stok where it showed that you had total assets of 59,000,000 and I guess there was an additional 6,000,000 that was unlisted, for a total of 64,000,-000?

A. I remember seeing it, yes.

Q. And then, during that testimony, you also ... that was when you made your estimate that, in fact, your current net worth would be approximately 1,000,000?

A. Yes.

Q. Can you explain to me in very general ... sort of give me a very generalized accounting of where the other $63,000,000 went? And let me just put a time frame on that. My understanding was that that 64,000,000 referred to a time frame of approximately 2012; is that accurate?

A. I don't know. I'm not sure what that document was prepared for. I believe while talking to you now and you're asking me this question that I included access to funds that were in the Norman South Trust so that they would contribute because they provided most of the funding that went to the U.S.A. and Dominican Republic. So it was a combination of both, but it was obviously prepared for a particular reason at that time.

Q. So for the purposes of preparing that balance sheet you were treating both your own personal assets and the Norman South Trust assets as one and the same?

A. For whatever that purpose was that it was to be used for, yes, but I would never consider it as one and the same.

It was just that they were both involved in similar investments.

[Tr., 481–82].

Likewise, with respect to the assets of his LLCs, he considered everything to be his personal money and used it whenever or wherever he wished, but could always fall back on business formalities and accounting when he deemed it necessary:

Q. And so, Mr. Edelsten, would you agree with me, as far as your U.S. operations were concerned, that you basically ... if you got money off of one [business entity] and you needed it at another, that's what you did?

A. Yes.

Q. If you got money off of selling Tennessee [the Investments Australia, LLC property] that didn't have to go into the escrow account at court and you needed to pay a bill in Dayton, that's what you did?

A. Yes.

Q. If you needed it back in Australia, you took it back to Australia, right?

A. Yes.

Q. You didn't have any operational separation between Barrington, for example, in the sense of the money flow that you were directing and Memphis? It could have gone in one and come out of the other, right?

A. It could, but it was all subject to being accounted for and proper bookkeeping to show ...

Q. Sure. But it was all at your direction because it was all your money, right?

A. Correct.

Q. That's the way you viewed it?

A. Yes, it was my money. I paid for everything.

[Tr., 465–66].

In the same manner, Edelsten felt he was justified in taking unilateral actions to secure his financial position regardless of the rights of the Mawardis or others. For instance, although the Mawardis were part owners of the Barrington property, Edelsten gave a mortgage to Highgate Road Pty. Ltd. (an entity owned by Edelsten's business accountant) without the Mawardis' consent and without receipt of any consideration to either the Mawardis or Barrington. Following is his testimony explaining his right to grant the mortgage and take any other actions he considered necessary to protect his financial interests:

Q. When you gave him the mortgage did you get permission from the Mawardis to give him that mortgage?

A. No.

Q. Okay, they were . . .

* * *

A . . . . excuse me, Mr. Stok, if I could just elaborate. It was a condition of all my investments at the very start with Matthew Militzok where Alfie Mawardi was present, that all of my investment in the U.S. or the Dominican Republic were to be secured by a mortgage and 9% interest. That was a condition. I didn't need to ask for permission.

Q. Well, where, where is that written, that condition? Where was that condition written?

A. It's been in a number of emails to Militzok between myself and he and Michael Webb, my Australian lawyer and he.

Q. But you don't have the Mawardis' signature on any of those emails do you?

A. I'm not sure if there are return emails or not but it was . . .

Q. You don't have one piece of paper anywhere in the world that says that the Mawardis agree that you could encumber all of the assets that they have in partnership with you on your own, isn't that a fair statement?

A. No, I don't think . . . I think it's grossly unfair. Who put up all the money?

* * *

Q. Okay, well where was it entered into? Where, where was that agreement entered into?

A. If it's not written then it was orally agreed before Mr. Militzok in his law offices.

Q. It was orally agreed?

A. Yes, absolutely.

[Tr., 384–86].

Throughout Edelsten's testimony, he attributed many acts to his agents, especially his attorneys and accountants, sometimes with his specific authorization and sometimes not. For instance, one of his attorneys, Christopher Robbins, handled numerous transactions for him in the United States, including management services for the Barrington property, but Edelsten blames Robbins for paying certain obligations of NG without his permission. Once again, this creates a situation where an outsider cannot tell when Edelsten has authorized an action and when he has not. The court is left with the distinct impression that these matters are being manipulated by Edelsten. On some issues he would understandably defer answering because the matter had been handled by his accountants or lawyers. But sometimes, even when he had testified definitively about something such as the source of borrowed funds or the status of an asset, he would later recant when pressed on cross-examination, explaining that his professionals would know best what he had

been talking about. Following is an example:

Q. Mr. Edelsten, you had previously been asked about whether or not you had borrowed money after the petition date in your personal bankruptcy case; do you recall that?

A. Yes.

Q. And you had stated that you had borrowed some funds. Can you please make a list for me of the funds that you've borrowed from the time that you filed bankruptcy?

A. I would need help back in Melbourne from Lindsey Hoskins because I'm not sure what I was referring to if that was the evidence I gave.

[Tr., 474].

A continuation of this testimony about post-petition loans also illustrates the ambiguity and sense of latent manipulation as to the source and character of funds "borrowed" by Edelsten:

Q. You had stated that there was some ... some amount in excess of $200,000 that you had borrowed, perhaps from your mother?

A. I think that the ... it was borrowed by Norman South.

Q. I'm sorry, can you say that again?

A. I think that it was borrowed by Norman South.

Q. You borrowed the money from the Norman South Trust?

A. It advanced it to me, yes.

Q. And who caused the trust to advance it to you?

A. Sorry, say again.

Q. Who caused the trust to advance the money to you?

A. I did.

Q. And are you obligated to repay that money?

A. I think the truth is only when I'm able to.

Q. But you do have an obligation?

A. To be fair it's ... it's not set in concrete and if I was unable to do so then I wouldn't have to.

Q. So is it then a gift to your bankruptcy estate?

A. It may become a gift.

[Tr., 474–75].

All of the above examples are illustrative of Edelsten's willingness to obfuscate the facts, recharacterize transactions, and take unauthorized and perhaps illegal actions to achieve his financial objectives. In addition, this pattern is reflected in his recent litigation tactics regarding the Mawardis. As more fully discussed earlier, Edelsten has routinely ignored judicial procedures and court orders and has cavalierly attempted to switch venues whenever it suited his purposes.

## LEGAL ANALYSIS

The issues before the court include whether these cases should be converted to Chapter 7, whether the cases should be procedurally consolidated, whether the cases should be transferred to Florida, whether the Mawardis should get relief from stay in the Edelsten case to pursue continued litigation in state court, and whether NG should be granted its motion to enforce the stay so as to prevent a monetary disbursement to the Mawardis. Additionally, the United States Trustee has requested appointment of an examiner in the Edelsten case.

### Procedural Consolidation

■ First the court will consider the identical motions filed by the Mawardis in each case to procedurally consolidate the three cases or transfer venue. In the motions, the Mawardis first argue that the three cases are so interconnected that they

should be jointly administered for procedural purposes. While it is true that the cases are interconnected, particularly in that Edelsten owns and controls Barrington and NG, each case is quite different in nature and, with the obvious exception of the Mawardis, they have different creditors. Barrington is a single asset real estate case with many of its creditors located in Ohio, especially security deposit claimants. Furthermore, that case is now under the control of an independent Chapter 11 trustee and its assets are soon to be sold. The creditors of NG, other than the Mawardis and Edelsten, consist of a few U.S. vendors and contractors for the now sold aircraft. Many of Edelsten's personal creditors are foreign and his financial affairs are much more complicated than either of the other cases.

Procedurally consolidating these cases, at least at this early stage, would unduly complicate matters for the creditors and other interested parties of Barrington and NG. Also, it is anticipated that many of the motions, objections, and other filings will be discrete to each case rather than applicable to all three. Consequently, the court will deny the motions to the extent they seek procedural consolidation at this time.

**Transfer of Venue**

Now the court addresses the Mawardis' second request, that venue for these cases be transferred to the Bankruptcy Court located in Broward County (Ft. Lauderdale), Florida. They assert that the cases of Edelsten and NG are improperly venued in Dayton, Ohio mandating a transfer. They alternatively assert that the interests of justice and convenience of the parties favor a venue transfer of all three cases.

■ The Debtors initially carry the burden of demonstrating proper venue in this district. *Bavelis*, 453 B.R. at 866, 873–74. Once proper venue is established, it is the movants requesting a change in venue, in this case the Mawardis, who carry the burden of proof by the preponderance of the evidence. *Id.* at 874.

## A. 28 U.S.C. § 1408: Establishing Venue

■ Venue in Chapter 11 cases is governed by 28 U.S.C. § 1408 which states:

Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408. The Mawardis argue that Edelsten does not meet the requirements of § 1408(1) because he is neither a resident of nor domiciled in Ohio nor are his principal assets here. Furthermore, they argue that NG has neither its principal place of business nor assets in Ohio and is, in fact, a limited liability company organized under the laws of another state. Consequently, they argue that both cases are improperly venued in Dayton, Ohio which mandates their transfer pursuant to § 1408(1) and the Sixth Circuit's decision in *Thompson v. Greenwood*, 507 F.3d 416

(6th Cir.2007) (mandating transfer or dismissal of a case improperly venued to a court with proper venue under § 1406 and § 1408).

What this argument does not take into account is that NG and Edelsten do not base their venue on 28 U.S.C. § 1408(1), but, instead on § 1408(2). This provision allows venue to be established based on a debtor being an "affiliate" of a separate bankruptcy that is properly venued and pending in the district. Edelsten asserts that he is an "affiliate" of Barrington Spring House and, consequently, properly venued here pursuant to § 1408(2).[11] Furthermore, he asserts that NG is an "affiliate" of himself. Thus, both affiliations rely first on Barrington Spring House being properly venued in this district.

No party disputes that Barrington Spring House is an Ohio LLC with its principal assets and principal place of business in Dayton Ohio. Consequently, it meets the requirement for venue in this district pursuant to § 1408(1). The only issue, then, is whether Edelsten is an "affiliate" of Barrington Spring House and NG is an "affiliate" of Edelsten for proper venue under § 1408(2).

An "affiliate" is defined in § 101(2) of the Bankruptcy Code as follows:

(2) The term "affiliate" means—

(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

(C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or

(D) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

11 U.S.C. § 101(2).

Based on this definition, Edelsten is an "affiliate" of Barrington Spring House through his capacity as sole owner and managing member of Altels Management, LLC and Altels capacity as sole owner and managing member of Barrington. Consequently, his bankruptcy case is properly pending here. Likewise, Edelsten is the

---

**11.** As noted earlier, the correct ownership alignment is that Edelsten is an affiliate of Altels Management, LLC, a Florida entity, because he owns 100% of Altels; Altels, is an affiliate of Barrington because it owns 100% of Barrington. Edelsten is therefore an indirect rather than direct affiliate of Barrington. That distinction was not addressed by the parties, but the definition of "affiliate" contained in 11 U.S.C. § 101(2) encompasses indirect affiliates, so the distinction appears to be without consequence.

sole member and owner of NG so that entity has "affiliate" status in relation to Edelsten. Consequently, the Debtors have established proper venue in this bankruptcy court pursuant to 28 U.S.C. § 1408.

### B. 28 U.S.C. § 1412: Transfer of Venue

■ Alternatively, the Mawardis request a transfer of venue pursuant to 28 U.S.C. § 1412 which provides that a "district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. Although the statute refers to a "district court," the bankruptcy court, as a unit of the district court, stands in the place of the district court for purposes of addressing venue. *See In re Ross,* 312 B.R. 879, 884 (Bankr.W.D.Tenn. 2004).

■ Because § 1412 is written in the disjunctive, a case may be transferred under either the interest of justice or convenience of the parties rationale. *In re Dunmore Homes, Inc.,* 380 B.R. 663, 670 (Bankr.S.D.N.Y.2008). Before looking at these separate rationales, the court notes that a decision to transfer a bankruptcy case is not one to be taken lightly. *Bavelis,* 453 B.R. at 869 (citing *In re Enron Corp.,* 274 B.R. 327, 342 (Bankr.S.D.N.Y. 2002)). While a debtor's selection of a proper venue is initially entitled to "great weight," the decision of whether to change venue is within the court's discretion based on a case-by-case analysis of convenience and fairness. *In re B.L. of Miami, Inc.,* 294 B.R. 325, 328–29 (Bankr.D.Nev.2003).

### 1. Interest of Justice

■ The court begins with the "interest of justice" component—a broad and flexible standard which must be applied on a case-by-case basis. *In re Patriot Coal Corp.,* 482 B.R. 718, 739 (Bankr.S.D.N.Y. 2012). Factors to be considered include whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness and fairness. *Id.; Bavelis,* 453 B.R. at 870. Also relevant is the integrity of the court system itself and the "learning curve" of the new judge if the case is transferred. *See Patriot Coal,* 482 B.R. at 739; *Dunmore Homes,* 380 B.R. at 672. While giving due consideration to the Debtors' choice of venue, the court is confident that the interest of justice supports transferring the Edelsten and NG cases to the United States Bankruptcy Court for the Southern District of Florida at Ft. Lauderdale while retaining the Barrington case in Ohio.

### a. Administration of the Bankruptcy Estate

■ Efficient administration of the estate is often deemed an important factor in analyzing the interest of justice in the context of a requested transfer of venue. *Bavelis,* 453 B.R. at 870. Barrington is the one case in which the management and administration of the estate could be detrimentally impacted by transferring it to Florida. That is because the real estate and its management are located in Dayton, Ohio and because of the significant local community interests impacted by the real estate. A motion to sell the real estate is currently pending and any delay in that process risks further degradation of the property. Although transfer of this case to Florida is feasible and would not be catastrophic, on balance it makes more sense to retain it in Ohio, the location of the real estate, its management, most of the security deposit creditors, and the

trustee.[12]

▮ As for NG, which at this point has been reduced to money in a trust account and potential avoidance actions, its venue would appear to have little impact on the economic administration of the estate. There might be a slight efficiency advantage by having the case located in Florida where the attorney and his trust account are located, and it may be more efficient to resolve the central issues in the case in the state where the primary witnesses reside.

In the Edelsten case, some administrative efficiency would be gained by a venue transfer to Florida because a number of key witnesses, claimants, and defendants and their currently retained counsel are in that state. However, the potential efficiencies would likely be much more dramatic than that because of the predominance of the dispute with the Mawardis and its impact on numerous significant claims and assets. Of particular importance is the interpretation of, and the potential assumption or rejection of, the Settlement Agreement which may result in highly contentious and complicated proceedings. It is conceivable that the court in the Florida Litigation may still have some role to play in this matter, but even if it does not, a number of related lawsuits, such as that filed by Liron Ben–Shimon and the Investments Australia, LLC insurance claim, remain pending in Florida. Ultimate resolution of these matters may be more efficiently realized where the joint venture and the resulting disputes originated.

### b. Judicial Economy

Judicial economy supports transferring all three cases to Florida to avoid proceedings in two separate bankruptcy courts. In making this determination, the court notes that the biggest impediment to an orderly administration in these interconnected bankruptcy cases is the Mawardis' ongoing dispute with Edelsten. That dispute immensely impacts these estates and involves matters of Florida law. After a long and arduous litigation process prior to the bankruptcy filings, the parties finally reached a settlement agreement that includes transfers of property related to all three bankruptcy entities. Some of those transfers have already occurred and indeed create the basis on which Edelsten obtained the authority to file the Barrington and NG cases. Edelsten disputes the finality of the Settlement Agreement while at the same time retaining some of the benefits of it. He may also dispute or attempt to avoid some of the transfers. However, there is no doubt in any one's mind that the interpretation of the Settlement Agreement, including its finality, is significant to all three bankruptcy estates and their ability to proceed towards a successful completion.

Because of the three (at least) pending non-bankruptcy cases in state and federal courts in Florida,[13] the many issues surrounding the history of the joint venture

---

12. The court notes that after the Barrington real estate and other assets have been liquidated and any local issues have been fully addressed the Chapter 11 trustee or other parties in interest in the Barrington case may determine that efficiencies will be enhanced if that case is likewise transferred to Florida. Consequently, this determination to keep the Barrington case in Ohio is without prejudice to any interested party renewing the request for a change of venue at the appropriate time.

13. Pending cases include the Florida Litigation (*Mawardi v. Edelsten et al.*), *Liron Ben–Shimon v. Edelsten et al.*, and the Investments Australia, LLC insurance claim in a federal court in Miami. Edelsten's schedules indicate that his lawsuit filed in federal court against the Mawardis is also still pending.

which originated there, and the location of key parties and witnesses there, judicial economy supports that the cases be transferred to a Florida bankruptcy court. *See, e.g., Dunmore Homes*, 380 B.R. at 674 (concluding that judicial economy was best served by transferring a debtor's case to California where several state court cases were pending against the debtor's subsidiaries and many issues in the cases would be governed by California law). Furthermore, it is possible that the Florida bankruptcy court may find that the Florida state court, having heard seven motions to enforce the Settlement Agreement, may be the best forum to interpret the agreement or its enforcement orders. Great efficiency may be gained by having both courts in the same city.

### c. Timeliness and the Learning Curve

Another factor to consider is the timeliness of the request for a venue change and whether the new judge would be subject to a substantial "learning curve" that might delay a final resolution to the case. *Dunmore Homes*, 380 B.R. at 674. These factors support a change of venue to Florida. The transfer motions were filed early in these cases and the serious business of determining the nature of the Settlement Agreement and assessing its ultimate impact on these estates has not yet begun. As mentioned above, the court with the greatest knowledge of the Mawardi dispute and the Settlement Agreement is the state court in Florida and it may be more efficient for the Florida bankruptcy court to access that knowledge and experience. Even if that does not occur, the Florida bankruptcy court will be more familiar with Florida law than a court in Ohio, so on balance the "learning curve" ultimately favors transfer to Florida.

### d. Fairness and the Integrity of the Bankruptcy System

Finally, the court touches on two related factors that are particularly applicable here and support a transfer of venue in these cases: fairness and the integrity of the bankruptcy system.

A meaningful example is found *In re Eclair Bakery Ltd.*, 255 B.R. 121 (Bankr. S.D.N.Y.2000). In *Eclair Bakery*, a debtor-bakery called Garden One, filed several sequential bankruptcy cases without counsel in the Eastern District of New York in an attempt to deal with a landlord-tenant dispute. *Id.* at 124–25. Each one was dismissed with the final dismissal including a finding of bad faith and a prohibition against Garden One from filing a bankruptcy petition again for two years in any district. *Id.* at 125. After the third dismissal, the landlord attempted to continue eviction proceedings against the bakery in a state court in the same district; at that point, Garden One assigned all of its assets and liabilities to a new entity called Eclair Bakery Ltd. *Id.* That entity filed a fourth case in a different district, the Southern District of New York. *Id.*

In considering the landlord's request for a transfer of venue back to the Eastern District, the bankruptcy court for the Southern District of New York noted that when a case is filed in a new district after virtually all the events leading up to it took place in proceedings in another district replete with unfavorable rulings, what you have is forum shopping. *Id.* at 142. The interest of justice and integrity of the bankruptcy court system require that the bankruptcy court not reward such efforts. *Id.*

While not identical, the parallels between *Eclair Bakery* and this case are significant. After careful review of the entire record in these cases, with particular attention to Edelsten's pattern of manipulation or multi-faceted "shell game" discussed earlier, it is this court's conclusion that these bankruptcy cases, particu-

larly Edelsten's and NG, were filed in Dayton, Ohio as an exercise of forum shopping.

Another recitation of Edelsten's financial manipulations is not necessary except to note that his cavalier treatment of security interests, property rights, and separate legal entities—asserting or disregarding such legal distinctions as suits his objectives—is likewise manifest in his use and abuse of the judicial system. When the Mawardis filed suit against him in a Florida state court, he tried to preempt them and switch forums by filing a similar action in federal court without informing the federal judge of the pending state court action. During the course of the Florida Litigation, he repeatedly disregarded the state court's orders and appeared infrequently, if at all, for hearings. He apparently conspired to file a foreclosure lawsuit in Ohio on the Barrington property despite the Florida court's orders and the appointment of a receiver. He frustrated and thwarted the Mawardis and the court during the course of litigating seven motions to enforce the Settlement Agreement and was scheduled to appear before the court for consideration of serious sanctions. Finally, having requested a hearing before the state court to consider his claimed setoffs to the Settlement Agreement, Edelsten and his affiliates filed bankruptcy in Ohio the day before the hearing, once again manipulating the process and causing additional costs for the Mawardis and wasted time for the court. While Edelsten and his affiliates may have a right to bankruptcy relief, they may not use the bankruptcy system as part of an abusive scheme to thwart justice and inflict harm on others.

Furthermore, it is an understatement to say that NG and Edelsten have a very "thin nexus" of connections to Dayton, Ohio. *See Dunmore Homes,* 380 B.R. at 675. Their only connection to Dayton, or Ohio for that matter, is that Edelsten is the owner of Altels Management, LLC (a Florida LLC) which owns Barrington Spring House, LLC, which owns the Riverside Park Apartments located in Dayton. Neither Edelsten nor NG have any assets or creditors located in Ohio. There is no compelling reason for these two cases to remain in Ohio.

On the other hand, serious injustice would be perpetuated by retaining the cases in Ohio rather than transferring them. Notwithstanding the size, complexity, and geographic scope of Edelsten's estate, the ongoing dispute with the Mawardis, including the ultimate disposition of the Settlement Agreement, predominates and will affect millions of dollars in assets and claims. The Florida Litigation precipitated the filing of these bankruptcy cases and it is not unreasonable to regard this as largely a two party dispute, a fight between the Mawardis and Edelsten over their rights in what remains of the Venture Properties. Edelsten was well aware of the financial difficulties faced by the Mawardis. By filing his cases in Ohio, he knew it would be much more difficult and expensive for them to assert their rights. Similarly, it will be more difficult and expensive for nearly all of Edelstens largest United States creditors (ten of the twelve are located in Florida), to participate in the bankruptcy cases if they remain in Dayton, Ohio.

The Debtors' choice of forum in this instance, with the apparent intention to punish their primary creditors and continue their manipulative and bad faith litigation tactics, undermines the integrity of the bankruptcy system and is fundamentally unfair to the Mawardis and the majority of their creditors in the United States.

In the end, although a debtor's selection of venue is accorded due weight, the Edelsten and NG bankruptcy cases simply do not belong in the Southern District of Ohio given the location of their business interests, major creditors (particularly the Mawardis), and prepetition litigation in Florida courts. Consequently, it is in the best interest of justice to transfer the Edelsten and NG cases to the United States Bankruptcy Court for the Southern District of Florida at Ft. Lauderdale.

### 2. Convenience of the Parties

 Even if the court were not persuaded that the interest of justice requires transfer of the Edelsten and NG cases to Florida, the same result is reached when the court considers the convenience of the parties. There are several factors that are considered in making the determination of whether convenience is served by a transfer of venue:

1) the proximity of creditors of every kind to the court;

2) the proximity of the debtor to the court;

3) the proximity of witnesses necessary to the administration of the estate;

4) location of the assets; and

5) the economic administration of the estate.

*Bavelis,* 453 B.R. at 869–70. Again, the most important factor is the administration of the estate. *Id.* at 870.

### a. Proximity of Creditors to the Court

 Consideration of the proximity and convenience of the creditors must include the number of creditors as well as the amounts owed. *Dunmore Homes,* 380 B.R. at 676. The court may also consider the quality of participation available to creditors. *Id.; B.L. of Miami, Inc.,* 294 B.R. at 334 (noting that a Nevada bankruptcy filing by a company whose business activities and trade creditors were in Florida would have the effect of unfairly reducing creditor participation in the reorganization process). In this analysis, the court will disregard the Australian and other foreign creditors for whom a forum in either Ohio or Florida would be equally distant and inconvenient.

With respect to Barrington, it is clear that a Dayton, Ohio venue is closer and more convenient for the majority of creditors. A significant number of unsecured creditors are local or regional service providers or current or former tenants of Riverside Park Apartments with claims to their security deposits. Nevertheless, the largest (and likely most active) creditors are the Mawardis whose $3,500,000.00 mortgage is already under attack in a separate adversary proceeding, and Highgate Road Pty. Ltd. which also holds a disputed $3,879,000.00 mortgage. Even if these mortgages survive attempted avoidance, their residual unsecured claims (assuming the value of the real estate is $1,500,000.00 and the validity of a priming tax lien of over $300,000.00) will dwarf all other unsecured claims with an aggregate value of only $108,687.14.

There are very few creditors in the NG case. Other than Edelsten, who is listed with a $6,000,000.00 unsecured claim, there are only five scheduled creditors from various states. The predominant issues appear to be the right of the Mawardis to receive the $1,100,212.33 sale proceeds currently held in their attorney's trust account in Florida and the validity of their equitable lien granted by the Florida state court. Clearly, the primary witnesses will be the Mawardis and any others who have been involved in the Florida Litigation. This factor strongly favors transferring the case to Florida.

Edelsten has argued that his personal case is complex, involving financial hold-

ings, creditors, and witnesses all over the world and throughout the United States. While that may be true, the specific venue in the United States is not particularly relevant to foreign creditors. Furthermore, it is very clear that his bankruptcy was not only precipitated by his dispute with the Mawardis, but will largely focus on the assets derived from that relationship and the interpretation of, and possible assumption or rejection of, the Settlement Agreement. As a consequence, the Mawardis are by far the most important creditors and witnesses in his case. Furthermore, of his 15 United States creditors, 12 are located in Florida. Of his 20 largest unsecured creditors, 10 are located in Florida. None of his creditors are located in Ohio. Although many of the unsecured claims are listed in his schedules as "unknown" in amount, it is clear that the Mawardis, with a claim of $10,057,391.36 are currently Edelsten's largest unsecured creditors. Based upon the number of creditors, the amounts owed, and the anticipated judicial activity generated by their claims, this factor strongly favors transferring Edelsten's case to Florida.

### b. Proximity of the Debtor to the Court

Edelsten is the only human owner (assuming the interests of the Mawardis and David Levy are extinguished) of Barrington and NG. Because he resides in Australia, proximity to the court should not be a factor for him in those cases or in his personal case. NG has no business operations and its only assets are funds in a Florida account and several avoidance claims, so proximity to the court is a negligible factor in that case. For Barrington, proximity to the court may be more important because its primary asset, real estate, is located in Dayton and those charged with its management, marketing, and sale are there. Once the real estate is sold (a motion to sell is currently pending), prox-

imity to the Dayton court may become much less important.

Other than the necessity of obtaining new bankruptcy counsel in Florida or paying travel expenses for Ohio counsel, little harm to any of the Debtors is likely should venue be transferred to Florida. With respect to Barrington, some of that harm is mitigated because the case is in the hands of a Chapter 11 trustee who is also licensed in Florida. Edelsten has continued to employ Florida counsel in Ohio for his personal bankruptcy case and that of NG to litigate all issues pertaining to the Mawardis.

### c. Proximity of Necessary Witnesses

As evidenced by two hearings in the Barrington case, the primary fact witness for Barrington is the property manager for Riverside Park Apartments, Corla Young, who lives in Dayton. There are also taxing authorities and various local government entities with strong interest in this case which may be required to testify. Local appraisers and accountants may also be involved. Otherwise, given the various disputes anticipated in the case, the most necessary witnesses will continue to be Edelsten and the Mawardis. For Barrington, this factor currently favors retention of the case in Ohio.

As already discussed, the NG case mostly concerns who has the right to the airplane sale proceeds. It is a struggle between the Mawardis who claim an equitable lien via state court order and Edelsten who claims entitlement to $6,000,000.00 as a creditor. As such, Florida is the best venue because it is where the key witnesses, the Mawardis live. Proximity is irrelevant with respect to the other key witness, Edelsten.

Edelsten's personal case is much more complex and unpredictable, but once the analysis is restricted to likely witnesses in

the United States, the conclusion is inescapable that Florida is the venue closest to the primary witnesses. Nearly all of the United States creditors and even some foreign creditors have claims relating to the Mawardis or the Florida Litigation.[14] The Mawardis, as both claimants and defendants, will clearly be central and they will consequently be likely witnesses in a myriad of proceedings. In addition, serious claims by or against David Levy and Liron Ben–Shimon, both of Florida, may require their presence as witnesses. On the basis of witness proximity, especially key witnesses essential to administration of the estate, Florida is without question the better choice of venue for the Edelsten bankruptcy case.

### d. Location of the Assets

■ Barrington is distinguished from the other two cases because its tangible assets consist of real estate (and a few accessory items of personal property) located entirely within Ohio and the case is under the control of a Chapter 11 trustee. Matters concerning real property have always been of local concern and are traditionally decided at the situs of the property. *Dunmore Homes*, 380 B.R. at 673. There is also a particularly strong local interest in this real estate because it is in a state of rapid decline and may become an attractive nuisance, a public danger, or an eyesore which may negatively impact the surrounding community. The location of the real estate in Ohio is unquestionably the strongest, if not determinative, reason for maintaining this case in Ohio. A mitigating consideration is that the real estate, Riverside Park Apartments, is no longer operating; the trustee is primarily focused on selling the property while securing it from further vandalism and theft. It may soon become an estate consisting of sale proceeds and avoidance actions.

NG's only assets are the funds held in trust by the Mawardis' counsel in Florida and some potential avoidance actions.[15] Based solely upon the location of the funds, venue is best in Florida.

Focusing only on Edelsten's assets in the United States, Florida appears to be the best venue for his case. He lists 13 U.S. business investments, mostly limited liability companies. Based upon testimony at the hearing, at least 8 of these enterprises were formed under the laws of Florida.[16] His schedules indicate claims against Florida residents the Mawardis and David Levy. As discussed earlier, he also appears to have a claim to 43% of any recovery from the insurance lawsuit currently pending in Miami, Florida pertaining to the Memphis property. He also may have interests in several parcels of Florida real estate that were referenced in his 2012 financial statement, orders in the Florida Litigation, and the Settlement Agreement.

In comparison, Edelsten has no assets in Ohio other than his indirect ownership of Barrington. The remainder of his assets are outside the United States; he has no significant assets in any other state.

---

**14.** Three foreign creditors appear to relate to the Dominican Republic casino properties which were part of the Venture Properties. Other than the obvious Mawardi and House of Nurielle debts, Edelsten has scheduled several claims of Florida accountants and lawyers that likely accrued during the dispute with the Mawardis. Even two claimants scheduled with a Colorado address reference Investments Australia, LLC and a casino management entity in care of Archer Bay, P.A., his Florida based attorneys.

**15.** The first such avoidance action was filed on April 1, 2014 against a Florida law firm.

**16.** These include Altels Management, LLC [Tr., 22], Investments Australia, LLC [Tr., 36], Millennium Management, USA, LLC [Tr., 75], and five Nurielle entities [Tr., 19–21, 65–66].

### 3. The Economic Administration of the Estate

The most important factor to consider when determining the convenience of the parties is the efficient management and administration of the estate. *Bavelis,* 453 B.R. at 870. However, it has already been discussed at length. Administrative efficiency strongly favors transfer of the Edelsten case to Florida and to a lesser degree the NG case. However, until such time as the Barrington real estate is sold and all local issues resolved, it is the court's current view that it would be best to retain the Barrington case in Ohio.

In conclusion, the factors the court has weighed in considering the convenience of the parties compels a determination that the Edelsten and NG cases must be transferred to Florida. In particular, the concentration of significant creditors, vital witnesses, assets, and pending lawsuits in Florida is in stark contrast to the complete absence of them in Ohio. Edelsten and NG have almost no connection whatsoever to Ohio which appears to be an inconvenient and more costly venue for everyone involved.

The Barrington case is an exception because of its real estate located in Ohio, the rapid deterioration of the premises, the appointment of a Chapter 11 trustee, and the fact that the sale process for the real estate has already begun. With that, the court will transfer the Edelsten and NG cases to Florida.

### Remaining Issues

Having decided to transfer venue of the Edelsten and NG cases to Florida, the court is deferential to the prerogative of the Florida court to make its own decisions on such substantive issues as conversion, relief from stay, and other matters affecting property of the estate. However, the court is also sensitive to the fact that these matters were the subject of considerable briefing and a two-day hearing before this court. Consequently, judicial efficiency favors adjudication of some of these matters by this court. With that in mind, the court will address the remaining motions in the following manner:

#### 1. Procedural Consolidation.

The court has already decided that procedural consolidation of the three bankruptcy cases is not appropriate at this time.

#### 2. Appointment of Examiner.

On the second day of the hearing, the court told the parties that the appointment of an examiner in the Edelsten case as requested by the United States Trustee was inevitable if the court chose not to transfer venue. All parties, including Edelsten were in favor of an examiner appointment except that the Mawardis opposed it if it would preclude transfer of venue. Because the court has decided to transfer the Edelsten case, it will refrain from ordering an examiner, keep the U.S. Trustee's Motion for Appointment of Examiner (doc. 56) pending, and defer to the Florida bankruptcy court.

#### 3. The Mawardis' Motion in the NG case to Dismiss or Convert and the Debtor's Emergency Motion to Enforce the Stay.

In the NG case, the Mawardis filed a Motion to Dismiss or Convert to Chapter 7 (doc. 14). The Debtor filed an Emergency Motion to Enforce the Automatic Stay (doc. 23). Both motions are ultimately aimed at the disposition of the $1,100,212.33 in sale proceeds currently in the trust account of the Mawardis' counsel. Based on the record to date, the court denies these motions without prejudice.

The Mawardis' request for dismissal is denied because it might jeopardize recovery of a number of prepetition allegedly unauthorized transfers and further complicate a fair distribution to creditors. Furthermore, while the evidence supports that Edelsten acted in bad faith during the course of the Florida Litigation, there is no postpetition basis justifying a conversion to Chapter 7; it is simply too early in the proceedings to convert this case.

The Debtor's Emergency Motion is essentially a request for a comfort order. Proceeds from the sale of the aircraft in the amount of $1,100,212.33 are currently held in the trust account of the Mawardis' attorney. Those funds are either property of the estate subject to the stay or they are not, and, correspondingly, disbursal of the funds either violates the stay or it does not. The Mawardis claim a right to immediate receipt of the funds based on the Florida state court's order and, presumably, in reliance on the receipt of those funds by wire transfer into their counsel's trust account prior to the bankruptcy filings. Unfortunately, the evidence presented to the court is insufficient to make a determination as to when the wire transfer occurred in relationship to the bankruptcy filing. In particular, the wire transfer and bankruptcy filings occurred on the same day and the timing of each was not established. In any event, this court's denial of the motion is without prejudice to further filings or to contrary determinations of the Florida bankruptcy court based on additional evidence.

### 4. The Mawardis' Motion to Convert the Edelsten Case and Motion for Limited Relief from Stay.

In the Edelsten case, the Mawardis also filed a Motion to Convert to Chapter 7 (doc. 19). As with the NG case, this motion is premature. Edelsten's prepetition conduct alone is insufficient to warrant conversion, especially with the possible appointment of an examiner and the need for a more complete investigation of Edelsten's assets and transfers. Consequently, the court denies the Motion to Convert to Chapter 7 without prejudice.

■■■ The Mawardis also filed a Motion for Limited Relief from Stay (doc. 21) in which they essentially ask for leave to return to the Florida state court for interpretation and enforcement of the Settlement Agreement. This court is unwilling to make a final determination on this request which may fundamentally impact the bankruptcy estate and will defer to the Florida bankruptcy court. The Mawardis' Motion for Limited Relief from Stay will remain pending or may be withdrawn voluntarily by the Mawardis without prejudice to refiling.

### 5. Request for Sanctions. (Contained in Motion to Procedurally Consolidate/Transfer Venue).

■■■ Finally, the Mawardis requested sanctions against Edelsten for filing the bankruptcies in Dayton, Ohio improperly. As noted before, Edelsten has established proper venue in this district pursuant to 28 U.S.C. § 1408 and the court has only decided to transfer venue using its discretionary powers under § 1412. As such, Edelsten engaged in no improper conduct by filing the bankruptcy petitions in this district. Consequently, sanctions are not warranted and the Mawardis request is denied.

### CONCLUSION

In summary, the court makes the following determinations that will be encompassed within separate court orders entered contemporaneously with this decision:

A. In Case No. 14–30054—Barrington Spring House, LLC:

 a. The Motion to Procedurally Consolidate/Motion to Transfer Venue (doc. 21, 35) is **DENIED;**

B. In Case No. 14–30055—Geoffrey W. Edelsten:

 a. The Motion to Procedurally Consolidate/Motion to Transfer Venue (doc. 13, 22) is **DENIED** with respect to procedural consolidation, but **GRANTED** with respect to transfer of venue and, accordingly, this case is **ORDERED** to be transferred to the United States Bankruptcy Court for the Southern District of Florida at Ft. Lauderdale;

 b. The Motion to Convert to Chapter 7 (doc. 19) is **DENIED** without prejudice;

 c. The Motion for Limited Relief from Stay (doc. 21) shall **remain pending** and subject to further consideration by the Florida bankruptcy court or may be voluntarily withdrawn without prejudice to refiling;

 d. The United States Trustee's Motion for Appointment of Examiner (doc. 56) shall **remain pending** and subject to further consideration by the Florida bankruptcy court or may be voluntarily withdrawn without prejudice to refiling;

C. In Case No. 14–30056—N770GE, LLC:

 a. The Motion to Procedurally Consolidate/Motion to Transfer Venue (doc. 11) is **DENIED** with respect to procedural consolidation, but **GRANTED** with respect to transfer of venue and, accordingly, this case is **ORDERED** to be transferred to the United States Bankruptcy Court for the Southern District of Florida at Ft. Lauderdale along with the related adversary proceeding *N770GE, LLC v. Archer Bay, PA, Adv.* No. 14–3055;

 b. The Motion to Dismiss or Convert to Chapter 7 (doc. 14) is **DENIED** without prejudice;

 c. The Emergency Motion to Enforce the Automatic Stay (doc. 23) shall **remain pending** and subject to further consideration by the Florida bankruptcy court or may be voluntarily withdrawn without prejudice to refiling; and

D. All requests for attorney fees or sanctions are **DENIED.**

**SO ORDERED.**